# CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF VIRGINIA

## V.

# SISSON AND RYAN, INC., ET AL.

Record No. 840962

November 25, 1987

Present: Carrico, C.J., Compton, Stephenson, Russell, Thomas, Whiting, JJ., and Harrison, Retired Justice.

John D. Eure (Ronald M. Ayers; Johnson, Ayers & Matthews, on briefs), for appellant.

Wilbur L. Hazlegrove (Woods, Rogers & Hazlegrove, on brief), for appellees.

THOMAS, J., delivered the opinion of the Court.

In September 1979, a building under construction on behalf of the Chesapeake and Potomac Telephone Company of Virginia (C & P) collapsed after a heavy rain. C & P sued its excavation-grading contractor, Sisson and Ryan, Inc. (S & R or the "grading contractor"), and S & R's surety, Federal Insurance Company (Federal). S & R filed third party claims against the project's architects, Smithey & Boyton (the "architects"), and against the project's general contractor, C. L. Lewis (the "general contractor"). The third-party actions were dismissed on demurrer. The case proceeded to a jury trial on C & P's motion for judgment. C & P claimed damages of $350,000 with interest, plus costs and attorneys' fees. The jury returned a verdict of $45,000, on which judgment was entered. In a post-trial proceeding, the trial court denied C & P's claim for attorneys' fees. C & P appeals.

C & P does not make a direct attack upon the adequacy of the damages. Instead, it argues that the trial was plagued by errors which resulted in jury confusion and which influenced the size of the verdict. Chief among these errors, according to C & P, was the admission of hearsay evidence. C & P also complains that it was entitled to recover attorneys' fees pursuant to its contract with S & R.

On September 14, 1978, C & P entered into a contract with S & R for the preliminary site work for C & P's Radford Work Center (the "site work contract"). The work center was to consist of a one-story building for the storage of tools and materials, and a two-story office building which contained a three-bay garage, a loading dock, and a pole and cable storage area. The site work contract consisted of several writings that were incorporated by reference; they included the September 14 agreement between C & P and S & R, the general conditions of the contract for construction, the supplementary general conditions, the EEOC re-

quirements, the specifications, and the drawings. The September 14 agreement between C & P and S & R governed in the case of inconsistencies with the general conditions of the contract.

S & R commenced work pursuant to the site work contract on September 15, 1978, the day after the agreement was signed. The work was substantially complete by mid-November 1978. Final inspection and acceptance of the work occurred in February 1979.

Louis Baltz, a C & P employee, testified that while S & R's work was in progress he visited the site and saw oversized material[1] piled up near the entrance gate but he thought that material was going to be "wasted" off site. He said that he never saw S & R use oversized material on the job. He testified further that C & P received reports from S & R showing that oversized material was being removed from the site.

According to Baltz, in February 1979, at the time of the final inspection, the site looked "beautiful." Oversized rock was nowhere in sight. He noted, however, that the site was frozen. Baltz stated that, to his knowledge, no one at C & P knew of any boulders in the landfill until the collapse of the building which led to the suit.

On cross examination, Baltz admitted that if C & P's soils engineer, Froehling & Robertson (Froehling), had been doing its job of inspecting S & R's work, it would have discovered the boulders. This is so, Baltz said, because the boulders, once uncovered, were obvious.

The contract for the construction of the tools building was executed in January 1979. Construction commenced in June 1979. The first indication of a problem with the site came in September

---

[1] The September 14 agreement gave specifications for the size rock that could be used at the site. It provided as follows:

1. Select material shall be excavated material consisting of a well graded mixture of soil and rock. Rock fragments shall not exceed 6" in any dimension.

2. Rock fill shall consist of materials such as blocks, cobbles, boulders and rock fragments reasonably well graded not exceeding 1'-0" in maximum dimension.

3. Oversized rock fill shall consist of boulders or blocks of rock exceeding 1'-0" in maximum dimension.
 a. Fill materials for use on the site except as otherwise specified shall be select material free from debris . . .
 1. Up to 30% of fill material, may be rockfill, if evenly distributed in the total fill.
 b. All other excavated materials shall be removed from the site.

1979. At that time, the mechanical contractor was using a backhoe to dig a drain line when the backhoe struck a "tremendous boulder." The backhoe could not move the boulder. After the incident with the boulder, a weekend intervened. There were heavy rains over that weekend. When work resumed, the contractor noticed cracks in the building.

Baltz visited the site on the Tuesday following the weekend rains. He observed the cracks in the walls of the building and also noticed that "the rear wall had a tremendous bow in it." Baltz asked Danny Sisson from S & R whether he knew of boulders being in the field. Sisson replied, "[s]ure, they are all across the site."

After the collapse of the building, Froehling made four or five test bores. At a meeting held October 30, 1979, the contractor questioned whether Froehling should investigate the collapse. As a result, C & P hired another soils engineer, Geotechnics, to determine the cause of the collapse.

John R. Cutright of Geotechnics testified concerning the tests run by his company and the conclusions that were reached. Five test pits were dug. Nineteen compaction tests were run in those pits. Seventeen of the nineteen tests were valid. Ten tests showed compliance with the 90% compaction requirement contained in the specifications; seven did not.

Geotechnics ran one hundred nine penetrometer tests. These tests show the strength of supporting soil, in place. The heaviest load from the tools building was 1,007 pounds per square foot (p.s.f.). Of the 109 tests, ninety-four were taken outside or away from the area where the rocks were nested.[2] Each of these tests showed sufficient strength to support the heaviest load of the building. The same was not true with regard to the fifteen tests taken in the area of the nested rocks, on the site of the building collapse. All of these tests "showed no strength. The soils were so weak they would not register on the device for strength."

Cutright testified that when the site was excavated, he observed large rocks so close together that soil could not be compacted around them. Some of the rocks were touching. Geotechnics discovered ground water seeping into pits and voids around the rocks. Cutright said that the way the rocks were placed, openings were

---

[2] Nested rocks were those close to or touching each other in violation of the specifications which required even distribution.

left around the rocks. The witness explained further that where water seeps into voids it causes readjustments in the soil and lets the rocks move; this movement undermines support to the materials over the rocks and can cause a structure, such as a building, to come down. He also pointed out, based on the results from an "unconfined compression test" conducted in the laboratory, that the load bearing strength of the soil around the nested rock was only 160 to 175 p.s.f. — clearly insufficient to support the building's load of approximately 1,000 p.s.f. He said the basic cause for the building's failure was the nested oversized rock.

Another Geotechnics representative made clear that the soil deficiencies were found almost exclusively in the area of the nested rock. The witness said further that it is physically impossible to compact around nested rock. According to him, the building would not have failed without the nested rock.

S & R's own witness agreed with C & P's experts on the reason for the collapse of the building. He testified as follows:

> The nested rock had a significant effect on the failure of the Group Tools Building; and I agree with Mr. Whitlow with the way it failed, how it failed, how the soil probably went through any voids that were there.
>
> It is probably settlement subsidence, and that is what really — the distress we see to this Group Tools Building is due in my opinion really to the nested rock.

During cross examination, the witness added the following:

> I agree with Mr. Whitlow and his evaluation as stated in his report. I did not see it myself.
>
> As he described it firsthand and as he shows it in his data, I believe him to be true; that that failure that we see is a result of rock that is in there.

C & P introduced its damage evidence in one exhibit. It contained a total figure of $321,733.68 representing the cost to replace the tools building.

## I.

One of S & R's defenses to the damage claim was that C & P paid more than was necessary to correct the problems caused by

S & R's misconduct. This approach was adhered to with regard to the cost of the soils testing for the remedial work. It is in this context that S & R's counsel was permitted to announce to the jury, during the taking of evidence, the original cost of the soils testing work done at the site prior to any construction.

Linwood L. Thomas, an employee of Froehling, was called as a witness for C & P. He testified concerning the cost of the soils work done by his company in attempting to determine the cause of the collapse and in attempting to direct the remedial work. On cross examination, S & R's counsel questioned him concerning the proposal for the original compaction testing. He asked Thomas whether Thomas knew how much C & P was charged for the original work. The witness said he did not know, and the following exchange occurred:

[S & R's Counsel]: If he obtains that information and gives it to us, will you stipulate —

[C & P's Counsel]: Here we go again, Your Honor. I will consider his request and advise [him] and the Court before this witness is excused.

Thereafter the witness continued to testify in response to further questions from S & R's counsel. At the end of his testimony, the trial court asked whether the witness could be excused. S & R's counsel responded as follows:

Yes; and if I need him to get the information that I have requested, the price for the compaction tests, the distribution of those compaction tests, and the plan submitted by [the architects], *if I need him* to find it and get those in the record, *I will call him as my own witness.*

(Emphasis added.)

Several days later, S & R's counsel stated to the trial court, in the presence of the jury, what the witness Thomas would have said with regard to the cost of the original soils work. He made this statement:

[I]n questioning Mr. Thomas with Froehling & Robertson . . ., when he was speaking in terms of the charges that had been made for various services, I asked him to provide us

with a cost of the charges that his firm made for compaction tests on the fill which started in September through November 1, 1978.

He has submitted a figure of $1,975 as the charge for that work.

C & P objected. The trial court permitted the representation to stand.

C & P complains that the statement was hearsay and that S & R failed to rely upon any exception to the hearsay rule in bringing the information to the jury's attention. According to C & P, S & R's counsel was simply allowed to testify. We agree.

It is a basic proposition in the law of evidence that hearsay is an out-of-court statement offered for the truth of what is asserted. The reason hearsay evidence is excluded is that it is not subject to the tests which help the trier of fact ascertain the truth of testimony. For example, where hearsay testimony is used the declarant is not present and cannot, therefore, be cross-examined. Because of this we have concluded that hearsay evidence, that is not admissible under any of the recognized exceptions, lacks any guarantee of trustworthiness and must be excluded. *See Stevens* v. *Mirakian*, 177 Va. 123, 131, 12 S.E.2d 780, 783 (1941).

Here, the only reason advanced as a basis for S & R's counsel's stating the cost of the original soils tests was expediency. The trial court explained that it admitted the statement because everyone knew that the intention was to introduce the statement "and had an opportunity to cross-examine him on it." C & P submits that it never had any opportunity to cross-examine Linwood Thomas of Froehling to establish the difference in circumstances that existed between the time the original soils work was done and when the remedial work was done. More specifically, C & P argues that it had no chance to explore the effect upon the costs of soils tests brought about by the use of different soils under totally different circumstances.

In short, C & P submits that whereas S & R was attempting to show that the remedial soils work could have been done less expensively, C & P was entitled to elicit testimony that the conditions were totally different at the time the remedial work was done. C & P submits further that S & R used its lawyer's hearsay statement to its advantage when it argued in closing that

whereas C & P sought approximately $35,000 for the remedial soils work, it had paid only $2,000 for the soils work done on the entire site at the beginning of the project. By contrasting the two figures, S & R was able to suggest that the figures for the remedial work were improperly inflated.

S & R contends that the amount it introduced as the cost of the original soils work was trustworthy because C & P's counsel conceded the accuracy of the amount in an argument on a motion for a new trial. S & R argues that the figure was relevant because the soils testing reports were in evidence. S & R cites no authority in support of its argument that the trial court correctly admitted the statement.

■ In our opinion, it was error to permit S & R's counsel to state to the jury the cost of the original soils tests. This amounted to the introduction of hearsay evidence by the attorney. C & P was deprived of its right to cross-examine to develop the facts which would show the change in circumstances from the time of the original work to the time following the collapse of the building.

## II.

C & P also contends that it should have been permitted to recover its attorneys' fees from S & R. S & R did not dispute the amount claimed by C & P. Instead, it disputed whether attorneys' fees were recoverable at all. The parties agreed to submit the question of attorneys' fees to the trial court following the verdict. The trial court ruled that attorneys' fees were not recoverable. It gave its reasons in a letter opinion as follows:

> The undersigned agrees that C & P cannot recover attorney's fees incurred in establishing its basic claim of breach of contract or in proving the elements of damage for such breach. Paragraph 4.18.1 [of the AIA form contract used by the parties] is an indemnity provision, the obvious intent and purpose of said provision was to protect C & P Telephone Company for claims asserted by third parties.
>
> . . .
>
> Our Supreme Court has steadfastly denied attorney's fees and costs unless there was a clear contractual provision providing for the recovery thereof. Again, the Court is convinced that the purpose of the indemnity clause was to hold harm-

less C & P from claims and expenses incurred in the defense of claims by third parties.

The trial court embodied this ruling in its final order.

C & P disputes the trial court's conclusion that paragraph 4.18.1 of the contract does not provide for the recovery of attorneys' fees in a case of this kind. According to C & P, it has proved all necessary facts for the recovery of attorneys' fees. C & P begins by focusing upon the contract language which reads in pertinent part as follows:

> To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Owner and the Architect from and against all claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss or expense (1) is attributable to . . . injury to or destruction of tangible property (other than the Work itself) . . . and (2) is caused in whole or in part by any negligent act or omission of the Contractor . . . regardless of whether or not it is caused in part by a party indemnified hereunder.

According to C & P, the reference to "work" in the provision refers to the preliminary site work which was S & R's responsibility. C & P argues that in order to secure the benefit of the provision, all it had to prove was the following three items:

1. that the claim for attorneys' fees arises from the performance of the preliminary site work,
2. that the claim for attorneys' fees is attributable to destruction of tangible property other than the preliminary site work, and
3. that the destruction of tangible property was caused in whole or in part by S & R's negligence.

C & P contends that each element was plainly established by the evidence. Thus, C & P argues, based on the language of the provision, that it is entitled to recover attorneys' fees and trial expenses.

S & R also bases its argument upon the language of the provision. According to S & R, because the provision includes the ar-

chitect as an indemnitee, because it excludes damages to the contract work itself, and because it indemnifies the owner and architect against liability partially deriving from their own negligence — the provision is one of indemnity against liability for property damage sustained by third parties. S & R apparently contends that indemnification does not operate *between* parties to a contract in a dispute involving those parties. In other words, S & R submits that it should not be required to pay C & P's attorneys' fees for asserting a claim against S & R. In addition, S & R argues that attorneys' fees cannot be recovered unless there is an express undertaking to stand liable for them.

In advancing its claim for attorneys' fees, C & P relies upon *Idaho State University* v. *Mitchell*, 97 Idaho 724, 552 P.2d 776 (1976), which C & P describes as quite similar to the instant matter. There, pursuant to paragraph 4.18.1, the owner was granted summary judgment against one of the contractors. The judgment included attorneys' fees. The Idaho Supreme Court reversed the summary judgment because it was of the view that certain facts were in dispute. Although the propriety of awarding attorneys' fees was not directly in issue, the court stated that if paragraph 4.18.1 were properly invoked, then attorneys' fees could be recovered.

S & R does not distinguish *Idaho State.* It simply contends that that opinion is contrary to the law of Virginia and thus is of little use in disposing of the present problem.[3]

---

[3] S & R cites several cases from other jurisdictions which, according to S & R, considered paragraph 4.18 and which, according to S & R, hold that the indemnity clause operates only where a loss is asserted by a third party. *Rodriguez* v. *McDonnell Douglas Corp.*, 87 Cal. App.3d 626, 151 Cal. Rptr. 399 (1979); *Marathon Steel Co.* v. *Tilley Steel, Inc.*, 66 Cal. App.3d 413, 136 Cal. Rptr. 73 (1977); *Corrao Constr. Co., Inc.* v. *Curtis*, 94 Nev. 570, 584 P.2d 1303 (1978); *Rovnak* v. *Union Carbide Corp.*, 64 A.D.2d 839, 407 N.Y.S.2d 323 (1978); *Hobbs* v. *Scorse*, 59 A.D.2d 1037, 399 N.Y.S.2d 783 (1977). We have reviewed each case. Contrary to S & R's representation on brief, not one of the cases it cites concerns paragraph 4.18. Moreover, only one of those cases, *Corrao Constr. Co.*, even discusses attorneys' fees, and there the fees were allowed based on the language of the particular indemnity clause under review in that case. 94 Nev. at 570, 584 P.2d at 305. Thus, the cases cited by S & R are either inapposite or they cut against S & R's argument.

As best we can determine, S & R's contention that the indemnity clause in this contract operates only where a third party sues is a misunderstanding of a rule we discussed in *Hiss* v. *Friedberg*, 201 Va. 572, 577, 112 S.E.2d 871, 875-76 (1960). There we wrote as follows:

It is well settled that as a general rule, in the absence of any contractual or statutory liability therefor, attorneys' fees and expenses incurred by the plaintiff in the

In our opinion, C & P is entitled to recover its attorneys' fees from S & R pursuant to paragraph 4.18.1 of their contract. We see no public policy limitation against this result such as S & R seems to suggest. We are committed to the view that parties may contract as they choose so long as what they agree to is not forbidden by law or against public policy. S & R contracted in paragraph 4.18.1 to pay C & P's attorneys' fees in certain situations, and we think the present situation falls fairly within the terms of that agreement.

### III.

S & R made several assignments of cross-error. Its main contention is that the trial court improperly excluded certain evidence which S & R sought to introduce. The evidence in dispute concerned whether S & R was given permission by the architects or the soils' engineers to use oversized rock in the landfill. According to C & P, the contract specifically precludes this defense.

S & R advances two main reasons why the evidence of what was known by the architects and soils engineers should have been admitted. The first reason is waiver. The second reason is the related doctrine of avoidable consequences. According to S & R, both defenses are sufficient to overcome the writing requirements contained in the contract documents. We disagree.

### A.

S & R submits that the doctrine of waiver is based upon the equitable consideration that one should not be allowed to insist upon the terms of an agreement after he has condoned nonperformance. According to S & R, the trial court erred in ruling that S & R was barred from adducing evidence of what was known by C & P's architects and soils engineer because the trial court did not recognize the distinction between "a parol agreement with the architect to amend the contract to accommodate

litigation of his claim against the defendant . . . are not recoverable as an item of damages in action *ex contractu.*

But there are various exceptions to and modifications of this rule. It is generally held that *where a breach of contract has forced the plaintiff to maintain or defend a suit with a third person,* he may recover the counsel fees incurred by him in the former suit provided they are reasonable in amount and reasonably incurred.

(Emphasis added.) The rule of *Hiss* has nothing whatever to do with this case because *Hiss* did not involve a contractual provision for attorneys' fees.

. . . nonconforming work" as opposed to "waiver through failure to reject work not conforming to the construction agreement as written." S & R suggests, without stating explicitly, that while the former may be barred by the contract provisions, the latter is not.

C & P responds that there could be no waiver of the type described by S & R in this case, because the contract will not permit it. C & P points to paragraph 7.6.2 of the contract which provides that:

> No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of any right or duty afforded any of them under the Contract, nor shall any such action or failure to act constitute an approval of or acquiescence in any breach thereunder, except as may be specifically agreed in writing.

In addition, it relies on the language of paragraph 4.3.3 of the contract which provides that:

> The Contractor shall not be relieved from his obligations to perform the Work in accordance with the Contract Documents either by the activities or duties of the Architect in his administration of the Contract, or by inspections, tests or approvals required or performed under Paragraph 7.7 by persons other than the Contractor.

C & P is plainly correct. In Virginia, we take the general view that where parties contract upon a subject, they should be bound by their agreement. *See Kirk Reid Co.* v. *Fine*, 205 Va. 778, 139 S.E.2d 829 (1965). Here, the contract is wholly in opposition to what S & R seeks to accomplish. For S & R's waiver argument to succeed we would have to ignore the plain language of S & R's agreement. This we will not do. We hold that the trial court properly excluded testimony that went to the issue of waiver based on imputing to the owner any knowledge that may have been acquired by the architects and soils engineer.

## B.

Whereas the matter of waiver concerns S & R's liability, the doctrine of avoidable consequences, as advanced by S & R, con-

cerns a limitation on damages. According to S & R, " 'This doctrine states that a party cannot recover damages flowing from consequences which that party could reasonably have avoided.' " 22 Am. Jur.2d *Damages* § 30.

■ S & R makes clear, on brief, that its avoidable consequences defense on the question of damages is tied inextricably to its ability first to impute knowledge from the architect and engineer to the owner. Obviously, then, the avoidable consequences approach must fail since we have held, in the preceding section, based on the contract provisions, that such imputation of knowledge is not permissible in this dispute.

### C.

■ S & R assigned cross-error to the trial court's refusal to grant instructions A-1, A-3, A-4 and B. Instructions A-3 and A-4 related to S & R's theories of waiver and avoidable consequences. We have held that those theories are inapplicable in this case. It necessarily follows that Instructions A-3 and A-4 were properly excluded.

S & R argues that Instruction A-1 should have been granted so that the jury could decide whether S & R should be held liable for the replacement of the tools building where, according to S & R, that structure was not shown on the pregrading plan as an improvement to be built following the completion of the excavation work. In order for S & R to prevail on this point, it would have to successfully establish that the damages attributable to replacing the tools building were consequential as opposed to direct; only in that situation would S & R's instruction A-1 have been appropriate.

■ However, as we stated in *Roanoke Hospital Association v. Doyle & Russell*, 215 Va. 796, 801, 214 S.E.2d 155, 160 (1975), the decision whether damages are direct or consequential is a question of law for the court. We also said in *Roanoke Hospital* that "[d]irect damages are those which arise 'naturally' or 'ordinarily' from a breach of contract; they are damages which, in the ordinary course of human experience, can be expected to result from a breach." *Id.*

Here, the trial court ruled that the following five items were all direct damages:

(1) the reasonable cost of removing and replacing the fill,

(2) the reasonable cost of removing and rebuilding the Group Tools Building to its stage of construction immediately prior to its failure,

(3) the reasonable expense of investigating the cause of the failure of the Group Tools Building,

(4) the reasonable expense of soils tests performed during the replacement of the fill material, and

(5) the reasonable expense for architectural services during the remedial work.

S & R offers no explanation why any of the items listed do not constitute direct damages.

■ We agree with the trial court that where a grading contractor is directed to complete work to certain specifications on a site where a building is to be constructed and he fails to do so, he should expect the building to collapse or otherwise be damaged. We hold that the trial court did not err with regard to the denial of Instruction A-1.

■ In its assignment of cross-error number two, S & R complains that the trial court erred in refusing its instruction "B on contributory negligence." We find no such instruction in the record. The record does contain Instruction A-6 which was proffered by S & R and refused by the trial court. That instruction concerned contributory negligence. But if that is the instruction to which S & R intended to assign error, it was properly refused because we agree with C & P that there is no evidence in the record that C & P was negligent.

## D.

S & R advances a general attack on the joinder of contract and tort claims in the same suit. According to S & R, this can and did cause confusion in the instant case.

■ Regardless of the merits of S & R's concern, the matter has been foreclosed by the action of the General Assembly. As C & P points out, Code § 8.01-272 permits it to plead a tort and a contract claim in the same action. C & P submits that had S & R desired, it could have requested separate trials of the two claims as a means of minimizing confusion.

## E.

 Federal makes two assignments of cross error. The first concerns the trial court's refusal to grant Instruction A-2. That instruction would have advised the jury that Federal could only be held liable for a breach of contract by S & R and that Federal's liability was limited to $99,346.49, the amount of the performance bond. Although Federal properly assigned error with regard to Instruction A-2, it abandoned that issue because no argument was made on that question either on brief or in oral argument.

Federal also assigned cross-error to the trial court's decision to add it as a party liable for the verdict the jury reached solely against S & R. Federal submits that under the instructions in the case, the jury could properly find against S & R without finding against Federal. In our view, Federal is correct and should not have been added to the verdict.

The trial court instructed the jury that S & R had breached its contract with C & P by using oversized rock in the fill. The trial court also instructed the jury that if it believed the losses sustained by C & P were a direct result of the breach, then it was required to find for the plaintiff. Further, the trial court instructed the jury that if S & R was liable for breach of contract, then Federal was liable along with S & R to the limits of its $99,346.49 performance bond.

In a separate instruction, the trial court advised the jury that S & R was negligent in using nonconforming material in the fill. It further instructed the jury that if it believed the negligence was the proximate cause of the damages sustained by C & P, then it was required to find for C & P.

The jury was given two choices for imposing liability upon S & R. One choice would render Federal liable to the extent of its bond limits, the other choice would make S & R liable by itself.

The jury was given verdict forms. A two paged stapled form contained two separate possible verdicts. The first verdict form provided for a finding against S & R. In the same paragraph, the first verdict form also provided a space for a finding against Federal. The second verdict form provided for a finding against S & R alone. The jury was not told that the first form was to be used if it imposed liability based on breach of contract, and the second form was to be used where liability was based in tort.

The jury executed *both* forms. However, on the first form, the contract form, it found against S & R. But on the part of the form concerning Federal, it made dash marks in the blank spaces indicating that it was not finding against Federal. The jury also filled out the tort form. On both the contract form and the tort form, it fixed a verdict of $45,000 against S & R alone.

 Upon review of the verdict, the trial court concluded "that, based on its verdict, the jury should have found that the act constituting both the negligence and breach of contract by defendant Sisson & Ryan, Inc., was a cause of plaintiff's damages and thus that the verdict should have been against both defendants, Sisson & Ryan, Inc., and Federal Insurance Company." In our opinion, the trial court was wrong. The jury's verdict in signing two forms while specifically leaving out Federal as a party liable for the verdict, must be taken to mean that the jury did not predicate liability upon breach of contract. Had it done so, it would have included Federal as one of the parties liable for the verdict. The jury was confused by the two forms which were never explained and which were not marked. The jury obviously thought it was required to fill in all the blanks. The essence of the verdict is that S & R was liable alone. This means then that S & R was liable in tort. This explains the jury's action in leaving Federal out of the verdict. Federal will be dismissed from further proceedings in this case.

## IV.

 For all the foregoing reasons, the judgment of the trial court will be reversed and the case remanded for a new trial limited to the issue of damages. In addition, on remand, the trial court shall fix the appropriate amount of attorneys' fees and award the same to C & P.

*Reversed and remanded.*