**CHAS. H. TOMPKINS CO., Plaintiff,**

v.

**LUMBERMENS MUTUAL CASUALTY CO., Defendant.**

**Civ. A. No. 89–1651–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

March 16, 1990.

V. Frederic Lyon, Lyon & McManus, Washington, D.C., for plaintiff.

Thomas H. McGrail, Arlington, Va. and Edward Graham Gallagher, Washington, D.C., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

This case, simply put, amounts to an effort by plaintiff to stretch a bid bond into a payment and performance bond. The effort fails. A bid bond is separate and distinct from a payment and performance bond; it covers different risks. Here, defendant signed a subcontractor's bid bond as surety. In conformity with the bid bond, the subcontractor delivered an executed contract for the work to be performed. But in violation of that bond, it failed to furnish a payment and performance bond. Plaintiff, the bid bond obligee, did not declare a breach of the bid bond, as it might have done, but chose instead to permit the subcontractor to proceed with performance. A year and one month later, with the job only partially complete, the subcontractor ceased performance and declared bankruptcy. A payment and performance bond, the usual remedy in these circumstances, did not exist. Thus, plaintiff, in an effort to salvage the situation, has seized on the bid bond and, in a three count complaint, claims (i) that defendant, as bid bond surety, was expressly obligated to furnish a payment and performance bond, (ii) that custom and usage in the

trade created an implied obligation for defendant, as bid bond surety, to issue the payment and performance bond, and (iii) that the failure to furnish a payment and performance bond was a breach of the bid bond entitling plaintiff to the penal sum of the bid bond. For the reasons stated herein, all three counts are fatally infirm. By express agreement between defendant and the subcontractor, defendant's issuance of the bid bond did not obligate defendant to serve as surety on any future bonds. Additionally, the bid bond expressly required that the subcontractor, not the defendant, procure the payment and performance bond. Nor does custom and usage create any obligations in the context of this case. Moreover, the statute of frauds bars enforcement of such an unwritten agreement. Finally, with respect to the third count, the complaint reflects that the general contractor materially altered the surety's risk, thereby excusing any obligation. That count also seeks impermissibly to recover payment and performance bond damages on the basis of a stale bid bond breach.

This action is before the Court on defendant's motion to dismiss. As the Court considered matters outside the complaint, this motion has been treated as one for summary judgment. *See* Rule 12(b), Fed.R.Civ.P. Because no material fact is genuinely disputed, the matter is ripe for summary disposition. *See* Rule 56, Fed.R.Civ.P.

*Facts*

Defendant, Lumbermens Mutual Casualty Company ("Lumbermens") is an Illinois corporation engaged, *inter alia*, in the business of acting as surety on bid bonds and on payment and performance bonds. Plaintiff, Chas. H. Tompkins Co. ("Tompkins"), is a District of Columbia corporation engaged in the business of a general contractor. It served as the general contrac-

tor on a commercial development project in Alexandria, Virginia known as the Trans Potomac Canal Center ("TPCC"). The owner and developer of TPCC was a Virginia company known now as Savage/Fogarty Real Estate, Inc. ("Savage/Fogarty").

In early October 1984, Savage/Fogarty invited AMPAT/Southern Corporation ("AMPAT") to bid on the subcontract for the window wall systems, store front systems and curtain wall work on the TPCC project ("the window wall subcontract"). In this connection, Savage/Fogarty provided AMPAT and other prospective bidders with contract documents and a Bid Form. On October 29, 1984, defendant, pursuant to a contractual relationship it had with AMPAT, executed a bid bond as surety for AMPAT's bid for the window wall subcontractor. The bid bond named Savage/Fogarty as the obligee [1] and conditioned payment on AMPAT's failure, should its bid succeed, to enter "into the [window wall subcontract] in writing, and give bond, with Surety acceptable to the Obligee, for the faithful performance of the said contract." In the event of a breach of the bid bond, defendant's obligation was to pay "damages which the Obligee may suffer by reason of such failure, not exceeding the penalty [10% of the bid amount] bond...."

Two days after Lumbermens executed the bid bond as surety, AMPAT submitted the $3.2 million bid for the window wall subcontract work at TPCC.[2] Two months later, on December 26, 1984, AMPAT was notified of its selection as the successful window wall subcontract bidder. Under the Bid Form, AMPAT was required to submit an executed window wall subcontract within 10 days, *i.e.*, by January 5, 1985. Yet for reasons not explained in the record, AMPAT waited until October 1985 to submit a signed window wall subcontract for $2,912,200.[3] Also due by January

---

**1.** Tompkins alleges that Savage/Fogarty thereafter assigned all its rights as bid bond obligee to Tompkins as general contractor. This allegation is accepted as true for purposes of this opinion.

**2.** AMPAT actually submitted two bids: (1) a base bid of $3,152,200.00, and (2) an alternative bid of $3,287,200.

**3.** The difference between the bid and subcontract amounts is not explained in the record, but is, in any event, immaterial to the resolution of the issues presented.

5, 1985, in accordance with the terms of the Bid Form and the Bid Bond, was a payment and performance bond. AMPAT never provided this bond. At this point, AMPAT was in default of the Bid Bond condition requiring the furnishing of a payment and performance bond. Tompkins in this circumstance could have taken steps to obtain a payment and performance bond or another subcontractor and compelled AMPAT or defendant to pay for any damages incurred in this regard up to 10% of the bid amount. Tompkins pursued neither of these courses of action, electing instead to permit AMPAT to begin performance of the contract. In February 1986, AMPAT stopped work and filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code.[4] At this point, AMPAT had completed only 21% of the job, for which it had received $614,896.

In April 1986, Savage/Fogarty contracted with another company to complete the window wall subcontract. This subcontract was for $2,297,304, the precise amount remaining under AMPAT's contract. Before work could be resumed, however, plaintiff and Savage/Fogarty paid $112,500 to regain shop drawings and materials seized by AMPAT's secured creditor, the Union Trust Company of Maryland.

*Count I*

Count I alleges that the bid bond imposed an express duty on Lumbermens to issue a payment and performance bond.[5] Tompkins asserts its entitlement to performance of this duty in two capacities: (i)

as the third party beneficiary of the bid bond contract between Ampat and Lumbermens, or (ii) as the assignee of Savage/Fogarty's rights as bid bond Obligee. In neither capacity, however, can Tompkins succeed.

Tompkins' third party beneficiary claim is thwarted by the General Agreement of Indemnity (the "Agreement") between Ampat and Lumbermens.[6] This Agreement is an integral part of the contract between Ampat and Lumbermens governing the issuance of bonds. It provides, in pertinent part, as follows:

> [Lumbermens] is not required, by reason of any applications for a bond or *by reason of having issued a previous bond or bonds* or otherwise, to execute or procure the execution of or participate in the execution of any such bond or bonds and [Lumbermens], at its option, may decline or [sic] execute or to participate in or procure the execution of any such bond without impairing the validity of this General Agreement of Indemnity. (emphasis added).

This language flatly and fully negates any duty on Lumbermens to issue a payment and performance bond after issuing the bid bond. Courts faced with similar clauses have so held. *See L & M Enters. v. Hartford Acc. & Indem. Co.,* 700 F.Supp. 517 (D.Colo.1988); *Green River Gas Co. v. United States Fidelity & Guar. Co.,* 557 S.W.2d 428 (Ky.Ct.App.1977); *Travelers*

---

4. The U.S. Bankruptcy Court for the District of Maryland later converted the proceeding to a Chapter 7 proceeding and appointed a trustee.

5. The bid bond provided in pertinent part:
 That we, [Ampat] ... (hereinafter called the Principal) as Principal, and [Lumbermens] ... (hereinafter called the Surety) as Surety, are held and firmly bound unto [Savage/Fogarty] (hereinafter called the Obligee) in the penal sum of 10% of Amount Bid ... for the payment of which the Principal and the Surety bind themselves ... jointly and severally....

 . . . . .

 NOW, THEREFORE, the condition of this obligation is such that if said contract be awarded to the Principal and the Principal shall within such time as may be specified, enter into the contract in writing, and give bond,

with Surety acceptable to the Obligee for the faithful performance of the said contract; or if the Principal shall fail to do so, pay to the Obligee the damages which the Obligee may suffer by reason of such failure; not exceeding the penalty of this bond, then this obligation shall be void; otherwise to remain in force and effect.

6. Tompkins asserts that it was not given adequate time to conduct discovery on the Agreement, and, therefore, summary judgment is inappropriate at this time. Review of Lumbermens' affidavit and the Agreement reveals that, at best, Tompkins has nothing more than a mere hope of discovering material that might negate the Agreement. This is an insufficient basis to forestall summary judgment.

*Indem. Co. v. Buffalo Motor & Generator Corp.,* 58 A.D.2d 978, 397 N.Y.S.2d 257 (1977). *But see L.F. Pace & Sons v. Travelers Indem. Co.,* 9 Conn.App. 30, 514 A.2d 766, *certif. denied,* 210 Conn. 811, 516 A.2d 886 (1986). Nor is there any doubt that Tompkins is bound by this language, for it is axiomatic that a third party beneficiary, as a non-negotiating party, must take the contract as he finds it. Lumbermens, therefore, was under no duty to Ampat, and through Ampat to Tompkins, to issue a payment and performance bond.

■■■ The soundness of this result is confirmed by commercial realities. A bid bond is separate and distinct from a payment and performance bond. A bid bond merely guarantees that the principal will subsequently enter into the contract with the appropriate security provided. A surety's liability for a bid bond breach is usually limited to the penal sum of the bond, typically 5–10% of the bid amount. By contrast, a surety issuing a payment and performance bond incurs a far more substantial risk. Such a bond guarantees the contract's performance and is generally written to cover the entire bid amount. Thus, a payment and performance bond breach may subject a surety to liability far in excess of the amount typically involved in a bid bond penal sum. As bid bonds and payment and performance bonds are distinct obligations covering different risks, so, too, does the decision to issue a bid bond involve different considerations from those operative in the decision to issue a payment and performance bond. It is, therefore, commercially reasonable for sureties, as here, to insert language in indemnity contracts with principals negating any duty to issue a payment and performance bond simply because a bid bond was issued. And it is commercially sensible, as well as legally correct, for the courts to give effect to this plain language. To hold otherwise effectively imposes an additional liability on the bid bond issuer not contemplated by the bid bond and contrary to the plainly expressed intent of the parties.

*L.F. Pace & Sons v. Travelers Indemnity Co.,* 9 Conn.App. 30, 514 A.2d 766, *certif. denied,* 210 Conn. 811, 516 A.2d 886 (1986), chiefly relied on by Tompkins, illustrates the potential for this anomalous result. There, as here, a principal sued a surety for its failure to issue a performance bond after having issued the bid bond. The surety's decision not to issue a performance bond, as here, rested on express contract language negating such a duty. Because no performance bond issued, the principal lost the job. On these facts, the Connecticut Court of Appeals ignored the contract language and permitted the principal to recover lost profits from the surety on an implied contract theory. Under *Pace,* therefore, a surety issuing a bid bond, but refusing to issue a performance bond, incurs not only the bid bond penalty liability, but also liability for the principal's lost profits. Given the rationale of *Pace,* a bid bond obligee suing a surety on similar facts would apparently recover performance bond damages when only a bid bond had issued. This nonsensical result is plainly not what the surety in *Pace* or the instant case bargained for in their contracts with the principals. Instead, commercial realities and the contract language expressly negating any duty to issue subsequent bonds clearly demonstrate the parties' intent that each bond be a separate and distinct transaction with no obligation to issue one arising from the prior issuance of another. If the parties intention were otherwise, they would save much time and expense by simply issuing a single bond covering bid and performance at the time the bid is submitted. That the parties here (and elsewhere generally) did not do so underscores that the issuance of bid bonds and payment and performance bonds are separate and distinct transactions such that a surety contract may, as here, make clear that the issuance of one does not warrant an implied obligation to issue the other. In sum, the contract between Lumbermens and Ampat unambiguously negates Lumbermens' duty to issue a payment and performance bond after having issued a bid bond. As a third party beneficiary to this contract, Tompkins cannot rise above or avoid this express language. Accordingly,

**1374**

Tompkins third party beneficiary claim fails.

■ Tompkins' claim as assignee of Savage/Fogarty's rights as bid bond obligee also fails. Although Tompkins, in its assignee capacity, is arguably not bound by the Agreement, it is bound by the terms of the bid bond. These terms, contrary to Tompkins' contention, make clear that the obligation to furnish a payment and performance bond falls on the principal (Ampat), not the surety (Lumbermens). The bid bond explicitly states that: "the Principal shall ... enter into the contract in writing, and give bond." Lumbermens' obligation arose only "if the Principal shall fail" to perform. In that event, the bid bond only required Lumbermens to "pay to the Obligee the damages which the Obligee may suffer by reason of such failure, not exceeding the penalty of this bond." Thus stated, Lumbermens' sole duty was to pay any damages Savage/Fogarty suffered, up to the penal sum of the bond, in the event Ampat failed either to enter into the subcontract when awarded or to post an acceptable payment and performance bond. Accordingly, the bid bond did not expressly impose any duty on Lumbermens to provide a payment and performance bond; that duty was Ampat's alone.

■ To avoid this result, Tompkins points out that the bid bond defined "Surety" as Lumbermens, and thus, the phrase "and give bond, with Surety acceptable to [Savage/Fogarty]" expressly contemplated Lumbermens would be the surety on the payment and performance bond. This, according to Tompkins amounts to an express duty of Lumbermens' to issue the bond. To support this conclusion, Tompkins asserts that "acceptable" refers to the amount and terms of the payment and performance bond, not to the identity of the surety. This argument is unpersuasive. The bid bond used "Surety" both (i) to identify Lumbermens specifically and (ii) to refer generically to all sureties in their role as guarantors, i.e., "and [Lumbermens] ...

(hereinafter called the Surety) as Surety." And a fair reading of the phrase Tompkins relies on yields the conclusion that "Surety" as used there referred to sureties generically as guarantors, not to Lumbermens specifically. Simply put, Tompkins' asserted interpretation of this phrase is strained and unnatural.

In sum, Tompkins, whether as assignee or third party beneficiary, cannot succeed in stretching the issued bid bond into a never-issued payment and performance bond.

*Count II*

■ Count II rests on implied contract. In Count II, Tompkins alleges that Lumbermens' duty to issue the payment and performance bond may be implied from the issuance of the bid bond and that it is the assignee of this implied duty. To create this contractual duty, Tompkins resorts to custom and usage. Specifically, Tompkins asserts that the local construction industry's custom and usage was that the surety who issued a bid bond would subsequently issue the payment and performance bond. As the parties are presumed to have contracted with reference to all industry customs and usages, Tompkins argues that a material issue of fact has been raised, and therefore summary judgment is not appropriate. The deficiency of this argument is manifest; custom and usage cannot be invoked to create contract duties that did not previously exist or that are inconsistent with the contract.

■ In Virginia, it is settled beyond dispute that while ambiguity is no longer a prerequisite before custom and usage may be used to supplement or explain a contract, this type of extrinsic evidence may not be used where it is inconsistent with the express terms of the contract. *See Columbia Nitrogen Corp. v. Royster Co.,* 451 F.2d 3, 8–9 (4th Cir.1971); *Piland Corp. v. REA Constr. Co.,* 672 F.Supp. 244, 247 (E.D.Va.1987); Va.Code Ann. § 8.1–205(4).[7] Any custom and usage that

7. Va.Code Ann. § 8.1–205(4) provides:
The express terms of an agreement and an applicable course of dealing or usage of trade

shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms

would require Lumbermens to issue the payment and performance bond, however, would be in direct conflict with the express language of the bid bond, which clearly states that it was Ampat's, not Lumbermens', duty to obtain that bond: "the Principal shall within such time as may be specified, enter into the contract in writing, and give bond." Lumbermens' sole duty was to pay for damages incurred by Savage/Fogarty as a result of Ampat's failure to enter into the subcontract or to provide a payment and performance bond. Thus, incorporation of custom and usage in this instance would contradict the express terms of the parties' agreement, a result not permitted under the most liberal interpretation of contract law.

Tompkins cites no apposite Virginia authority to support the use of custom and usage in this case. Rather it relies on decisions from other jurisdictions. *See L.F. Pace & Sons v. Travelers Indemnity Co.*, 9 Conn.App. 30, 514 A.2d 766 (1986); *Commercial Insurance Co. v. Hartwell Excavating Co.*, 89 Idaho 531, 407 P.2d 312 (1965). These decisions are readily distinguishable. In *Pace*, the court permitted use of custom and usage only after determining, erroneously, that the indemnity agreement between the principal and surety was silent as to whether the surety had a duty to issue a performance bond following issuance of a bid bond. In fact, the agreement there in issue included language expressly negating any duty by the surety to issue a performance bond arising from the surety's issuance of a bid bond. This language should have precluded a conclusion that the agreement was silent on this point. The Connecticut court's contrary conclusion is inexplicable. *Hartwell Excavating Co.* is also easily distinguished. There, the court permitted evidence of custom and usage only after ascertaining that the principal's application for bonding was ambiguous as to whether it covered only a

bid bond or a performance bond as well. In both cases, custom and usage were admitted to construe documents that were ostensibly either silent or ambiguous as to the parties' rights. That is not the situation in the case at bar. Lumbermens' bid bond was neither silent nor ambiguous, but rather, as noted above, it clearly delineated each parties rights and duties. Significantly, it expressly imposed the duty to provide a payment and performance bond on Ampat alone.

In reality, Tompkins' assertion of custom and usage here seeks neither to explain an ambiguous document, nor to supplement the rights and obligations already expressed in the bid bond. Instead, it is invoked to create a new, additional contract right. Virginia law, however, has long barred such use of custom and usage evidence. *See Charles Syer & Co. v. Lester*, 116 Va. 541, 82 S.E. 122 (1914) (custom may not be used under guise of explaining contract language to engraft a substantial defense not present in the express terms). Additionally, the significant nature of the contract right sought to be created here militates against application of custom and usage in this case. This is not a case where custom and usage are used to clarify a contract term. *See, e.g., Brunswick Box Co. v. Coutinho, Caro & Co.*, 617 F.2d 355 (4th Cir.1980) (custom and usage used to determine parties understanding of "F.A.S. vessel"); *Columbia Nitrogen v. Royster Co.*, 451 F.2d 3 (4th Cir.1971) (used to explain significance of "minimum tonnage"). Instead, Tompkins seeks here to use custom and usage as the source of a significant new contract duty—that of total performance guarantee—a duty far beyond those embodied in the bid bond. Reasonably, courts expect contracting parties to address in express terms the most substantial duties and liabilities that go to the very heart of their bargain. Prudence dictates that such matters not be left to the va-

---

control both course of dealing and usage of trade and course of dealing controls usage of trade.
This Uniform Commercial Code provision is enacted in Article 1, the General Provisions. Accordingly, it is not limited merely to contracts

for the sale of goods, but extends to all commercial contracts. Moreover, this provision arguably supports the construction of noncommercial contracts by analogy. *See* E. Farnsworth, *Contracts* 507–08 (1982).

garies of implication. It would be astonishing indeed if custom and usage could create such major new obligations, even in the face of silence, for the stated purpose of incorporating this extrinsic evidence is to supplement and explain the express document, not to draft its essential terms. That is the office of the parties, not of the courts applying rules of construction. Accordingly, custom and usage must be excluded as they are clearly inconsistent with the express terms of the bid bond and would, effectively, result in the creation of a significant, new contract liability well in excess of that embodied in the bid bond.

Sound policy reasons also militate against judicial imposition of an implied duty on a surety to issue a payment and performance bond following issuance of a bid bond. As already noted, requiring the bid bond surety to issue a payment and performance bond on the basis of custom and usage may trivially reflect what often happens, but importantly erases the valid distinction between the two risks. The bid bond surety merely insures the risk that the principal may not (i) enter into the contract or (ii) furnish a payment and performance bond. In this capacity, the surety's liability is typically limited, as here, to 10% of the bid amount or actual damages attributable to obtaining substitute performance. To assess whether it wishes to undertake this risk, the surety may investigate the financial strength of the principal and the validity of the bid. At this point, however, the bid bond surety cannot know the bid differential, *i.e.,* the spread between the principal's bid and those of its competitors. This information may be important to an assessment of the risk embodied in the payment and performance bond as it may bear on the principal's ability to complete the job. For example, the principal might purposely underbid to ensure selection of its bid in an attempt to bolster a poor financial condition. An underbid, therefore, may be a potential warning that the principal may have falsified the financial information provided to the surety.[8] Alternatively, the underbid may be due to a mathematical error in the bid calculation,[9] or the principal may have negligently undervalued the entire project.[10] By disclosing such problems, bid differential information can play an important role in the surety's evaluation of the performance risk. Depriving the surety of this information is commercially unreasonable and inconsistent with the existence of the bid bond and the payment and performance bond as separate transactions. The fact that sureties issue bid bonds without knowing the bid differential is not inconsistent with this conclusion, but rather is readily explained by the difference in the magnitude of the underlying potential liabilities. Sureties are entitled to full knowledge of all available facts before they agree to guarantee performance. Imposing on bid bond issuers an implied duty to issue a payment and performance bond is likely to make bid bonds more difficult and more costly to obtain.

*Affirmative Defenses*

Lumbermens also argues that its affirmative defenses of waiver and the statute of frauds warrant threshold dismissal of counts I and II of the complaint. Each defense is separately addressed.

 As its first defense, Lumbermens argues that enforcement of any promise to pay for Ampat's performance is barred by Virginia's Statute of Frauds, which provides in pertinent part:

No action shall be brought in any of the following cases:

. . . . .

(4) To charge any person upon a promise to answer for the debt, default, or misdoings of another;

. . . . .

8. *See, e.g., Independent School District No. 24 v. Weinmann,* 243 Minn. 469, 68 N.W.2d 248 (1955).

9. *See, e.g., Triple A Contractors, Inc. v. Rural Water District No. 4,* 226 Kan. 626, 603 P.2d 184

(1979); *City of Newport News v. Doyle & Russell, Inc.,* 211 Va. 603, 179 S.E.2d 493 (1971).

10. *See, e.g., L & M Enters. v. Hartford Accident & Indem. Co.,* 700 F.Supp. 517 (D.Colo.1988).

Unless the promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged thereby, or his agent. . . .

Va.Code Ann. § 11–2 (Repl.Vol.1989). This section bars guaranties unless they are evidenced by a writing. *See American Indus. Corp. v. First & Merchants Nat'l Bank,* 216 Va. 396, 219 S.E.2d 673, 675 (1975). The writing, however, need evidence only the essential terms of the agreement; it need not be the agreement itself. *Id.* To ascertain whether a promise is a guaranty or not, the Court must determine the intention of the parties from the totality of the circumstances including the parties' words and their situation. *See Colonial Ford Truck Sales v. Schneider,* 228 Va. 671, 325 S.E.2d 91, 93 (1985).

 Measured against this standard, there is no writing concerning a duty to issue a payment and performance bond sufficient to avoid the bar of the statute. The bid bond does not evidence any terms, essential or otherwise, of an agreement by Lumbermens to pay for Ampat's performance default. Moreover, it specifically places the duty to procure the payment and performance bond on Ampat alone: "the Principal shall ... give bond." Tompkins' attempt to stretch a bid bond into a payment and performance bond endeavors "effectually [to] repeal" the statute of frauds, and, as such, it must be rejected. *See Schneider,* 325 S.E.2d at 94.

 In contrast, Lumbermens' waiver defense is not conclusive at this stage. To be effective, a waiver requires that the waiving party voluntarily and intentionally abandon a known legal right. *See Bergmueller v. Minnick,* 238 Va. 332, 383 S.E.2d 722 (1989); *Employers Commercial Union Ins. Co. of America v. Great American Ins. Co.,* 214 Va. 410, 200 S.E.2d 560, 562 (1973). As Tompkins' right to the payment and performance bond accrued in January 1985,[11] its acquiescence in Ampat's

unsecured performance through February, 1986 arguably represents a voluntary pattern of conduct demonstrating an intent to waive its right. But a clause in Ampat's subcontract required that all waivers be in writing. And a recent decision by the Supreme Court of Virginia holds that such clauses must be given effect. *See Chesapeake & Potomac Tel. Co. v. Sisson & Ryan, Inc.,* 234 Va. 492, 362 S.E.2d 723, 730 (1987). Thus the doctrine of waiver in not available to Lumbermens as a defense.

While *Sisson & Ryan* is eminently sensible on its own facts, it may not apply to the facts at bar. There, the Supreme Court of Virginia held that an express provision requiring that waivers be in writing precludes a waiver by conduct of an *express contractual duty.* Here, by contrast, the question is whether a written waiver provision precludes a waiver by conduct of an *implied duty.* It is clear that a provision requiring written waivers precludes using conduct to find a waiver of an express contract right or duty. Far less clear is whether such a provision should bar a conduct waiver of a duty or right implied from custom or usage. In any event, the Court does not reach this question and does not rely on the doctrine of waiver for its disposition of this case.

*Count III*

· In Count III, Tompkins sues on the bid bond itself. While there is no dispute that Ampat defaulted on the bid bond, this cause of action is flawed in two related respects. First, on its face, Tompkins' complaint demonstrates that the long period between the date the payment and performance bond was due and Ampat's abandonment of the TPCC project materially altered the risk Lumbermens had underwritten. In Virginia, a compensated surety will be excused from its obligation if the other parties materially alter the underlying risk without its consent. *See Board of Supervisors v. Southern Cross Coal*

---

11. The bid form submitted by Ampat to Savage/Fogarty required issuance of the payment and performance bond within 10 days of the bid acceptance. The subcontract required the bond issuance within 10 days of receipt of the subcon-
tract. Since the receipt of the subcontract and the bid acceptance both occurred on December 26, 1984, the payment and performance bond should have been furnished no later than January 5, 1985.

*Corp.*, 238 Va. 91, 380 S.E.2d 636, 638 (1989); *Southwood Builders, Inc. v. Peerless Ins. Co.*, 235 Va. 164, 366 S.E.2d 104, 107–08 (1988). Here, the risk Lumbermens insured against in the bid bond was that Tompkins would default Ampat, prior to contract performance, for failure either to enter into the subcontract or to provide the requisite payment and performance bond. The risk was not that a new subcontractor might have to be located long after performance began because Ampat might subsequently walk off the job. Tompkins acquiescence in Ampat's unsecured performance materially altered Lumbermens' exposure. Lumbermens bid bond obligation, therefore, is excused.

■■■■■ The material alteration of the bid bond risk is vividly illustrated by Count III's second flaw. Simply put, Count III's allegation of a bid bond breach is a masquerade. In fact, the count explicitly seeks damages not for a bid bond breach, but for a payment and performance bond breach. Tompkins' counsel essentially conceded this fact in the course of oral argument. He confirmed that Tompkins, in Count III, seeks to recover delay damages attributable to Ampat's work stoppage, as well as damages for payments made to Ampat's creditors for the shop drawings seized at the time of the work stoppage. These damages bear no resemblance to bid bond damages which include, alternatively, (i) the price differential between the original and replacement subcontracts or (ii) the costs of providing a substitute payment and performance bond. Additionally, the obligee may recover the costs, including delay damages, associated with locating the substitute subcontractor or another payment and performance bond. In any event, bid bond damages are limited by the penal sum of the bond. It is no wonder that Tompkins does not seek bid bond damages. So much time elapsed between the bid bond breach and Ampat's work stoppage (thirteen months) that such damages no longer make sense. Tompkins waited so long to assert a bid bond breach that its claimed losses are in the nature of payment and performance bond damages, not bid bond damages. This underscores that

Tompkins dilatoriness in claiming a bid bond breach served materially to alter Lumbermens' risk. Accordingly, Count III fails.

An appropriate Order has issued.