**NORTHWEST AIRLINES, INC.,
Plaintiff/Counterclaim
Defendant,**

v.

**METROPOLITAN WASHINGTON
AIRPORTS AUTHORITY, Defendant/Counterclaim Plaintiff,**

and

**Continental Airlines, Inc., Intervenor–
Defendant/Counterclaim
Plaintiff.**

**Civil Action No. 95–1362–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

April 30, 1996.

Anthony John Trenga, Charles F.B. McAleer, Jr., Bijan Gilanshah, Hazel & Thomas, P.C., Alexandria, Virginia, For Northwest Airlines.

Fern P. O'Brian, David S. Eggert, Ellen T. Noteware, Arnold & Porter, Washington, D.C., For Continental Airlines.

John L. Oberdorfer, Benjamin G. Chew, Patton Boggs, L.L.P., Washington, D.C., For Metropolitan Washington Airport Authority.

## MEMORANDUM OPINION

ELLIS, District Judge.

This contract diversity action raises questions concerning the interpretation of the contract between the Metropolitan Washington Airport Authority and various airlines regarding the use of gate and baggage space at Washington National Airport.

## I

The Washington National Airport ("National") is owned by the federal government. Prior to 1990, it was operated by the Federal Aviation Administration ("FAA"). In 1977, the FAA entered into a lease entitled the Unit Terminal Agreement (the "UTA") with Northwest Airlines ("Northwest") and Trans World Airlines ("TWA") concerning the Unit Terminal, the terminal at the southern end of the terminal complex.[1] Pursuant to the UTA, Northwest and TWA leased the entire Unit Terminal premises, including Gates 1B and 1 through 8 and the baggage make-up area on the lower level of the terminal, until June 30, 1980. The UTA also provided for three five-year extension periods at TWA's and Northwest's option. The airlines exercised these options, extending the UTA to June 30, 1995, when it expired.

In 1986, Congress authorized the transfer of National and Washington Dulles International Airport ("Dulles") to the Metropolitan Washington Airports Authority (the "Author-

ity"), which had been created by acts of the Commonwealth of Virginia and of the District of Columbia.[2] Recognizing the need for improvements at both airports, the Authority devised the Capital Development Program ("CDP"), a plan encompassing all anticipated improvements at the two airports.[3] To facilitate the extensive construction and renovation efforts necessary to implement the CDP, the Authority negotiated a comprehensive agreement among all the airlines and the Authority. These negotiations culminated in the 1990 Airport Use Agreement and Premises Lease (the "Use Agreement"), which became effective on January 1, 1990 with a twenty-five year term.[4] The Use Agreement serves two basic functions, namely (i) granting "to the Airline certain rights to use facilities to conduct its Air Transportation Business at either National or Dulles, or both," and (ii) providing "for the lease to the Airline of certain Equipment and Premises at the Airport(s) for the same purpose." Use Agreement § 1.01. An important step in performing these functions was the Use Agreement's express cancellation of all then-existing agreements with the airlines, except for certain leases or contracts identified as surviving agreements. Those agreements, the Use Agreement stipulates, "shall continue in effect until they expire or are terminated." Use Agreement § 2.03. The Northwest/TWA UTA was recognized as one such surviving agreement. See Use Agreement, Exhibit N–K. And, as noted, the UTA, after three extensions, expired by its own terms on June 30, 1995.

In 1991, Northwest sought to establish a "mini-hub" at National. To achieve this goal, Northwest required a number of contiguous gates at National. So in April 1991, Northwest negotiated with TWA to have the latter

---

1. Northwest and TWA built the Unit Terminal under a series of agreements with the FAA and first occupied it in 1970.

2. See Metropolitan Washington Airports Act of 1986, Title VI of Pub.L. 99–591 (formerly codified at 49 U.S.C. app. 2451 et seq.); 1985 Va.Acts of Assembly Ch. 598; 1987 Va.Acts of Assembly Ch. 665 (as amended); D.C.Law 6–67 (as amended). The airports remain federally owned, and the federal government has leased the airports to the Authority for fifty years commencing on June 7, 1987.

3. Because of public concern about the level of noise and aircraft activity, a cornerstone of the CDP was that the number of gates at National would not be increased beyond the current total of forty-four gates. The CDP also provided that thirty-five of those gates would be located in the new terminal now under construction.

4. The Use Agreement was actually a series of almost identical bilateral agreements between the Authority and each signatory airline.

assign its gates in the Unit Terminal, Gates 5 through 8, to Northwest. That transfer was documented as Amendment 5 to the UTA. Northwest therefore became the lessee of all nine gates in the Unit Terminal. In 1992, Northwest abandoned its plans for a mini-hub at National, and consequently found itself as the lessee of more gates than it needed for its operations. Accordingly, in November 1992, Northwest subleased Gates 5, 6, and 7 to Continental, Gate 8 to America West, and Gate 1B to Midwest Express. At the same time, Northwest and Continental entered into a ground services agreement, pursuant to which Northwest was to provide baggage handling services for Continental flights using the Unit Terminal. The Authority granted its approval of the Continental sublease,[5] which is documented as Amendment 9 to the Use Agreement.

In anticipation of the UTA's expiration in 1995, the Authority notified Northwest of its intent to lease to Northwest only the space Northwest was using for its own operations, namely Gates 1–4 and related space. Northwest replied that although the UTA was due to expire, Northwest's rights as a lessee to all nine Unit Terminal gates derived from the Use Agreement, and therefore the Authority had no right to lease the other five gates to other airlines. On September 11, 1995, after considering the differing views of Northwest and Continental, the Authority formally offered to lease Gates 1–4 to Northwest and offered to Continental, Midwest Express, and America West leases for the Unit Terminal gates these airlines previously had been subleasing from Northwest. The Authority included in its offer to Northwest a lease for the baggage handling area which serves all the gates and ticket counters in the Unit Terminal, indicating that Northwest was expected to reach a baggage handling accommodation with the other Unit Terminal tenants, either by continuing the existing agreement or by negotiating a new agreement to share space and equipment with the other airlines. Northwest rejected the offer of a lease for the four gates and the baggage handling area on September 21, 1995, continuing to assert that its rights as lessee derived from the Use Agreement and therefore survived the UTA's expiration. Continental, however, accepted the Authority's offer and entered into a direct lease with the Authority for Gates 5–7 on October 1, 1995.

Northwest filed this action against the Authority on September 28, 1995,[6] and Continental was promptly granted leave to intervene as a defendant. *See* Rule 24, Fed. R.Civ.P.[7] The Authority and Continental each filed answers and counterclaims.[8] Thereafter, the parties filed cross-motions

---

5. The Use Agreement provides that airlines must obtain the prior written approval of the Authority for all subleases of space at the two airports. *See* Use Agreement § 16.01.

6. Northwest's complaint lists eleven counts:
   1. Declaratory judgment as to Northwest's rights to lease all eight gates.
   2. Breach of contract against the Authority.
   3. Declaratory judgment as to the validity of the direct lease between Continental and the Authority.
   4. Declaratory judgment as to Support Services Agreement.
   5. Failure to pay rent against Continental.
   6. Breach of contract against the Authority.
   7. Interference with contract against the Authority.
   8. Intentional interference with prospective advantage against the Authority.
   9. Interference with contract against Continental.
   10. Anticipatory breach of contract against Continental.
   11. Declaratory judgment as to lease of baggage makeup area.

7. Continental sought intervention as of right pursuant to Rule 24(a) and, in the alternative, permissive intervention pursuant to Rule 24(b). The record does not reflect which form of intervention was granted. Because Continental intervened as a defendant, both Continental and the Authority will be jointly referred to as the "defendants."

8. Continental counterclaims for:
   1. Declaratory judgment as to contract rights.
   2. Injunction against breach of contract, breach of covenant of good faith and fair dealing, and interference with property rights.
   3. Unjust enrichment; assumpsit for money had and received; restitution.
   4. Declaratory and injunctive relief concerning rights to the baggage makeup room.
   The Authority counterclaims for:
   1. Breach of contract.

for summary judgment, which were denied on January 17, 1996 without prejudice to the motions being renewed after discovery. Recently, the parties renewed their summary judgment motions, which they supported with extensive legal memoranda and oral argument. Accordingly, the matter is now ripe for disposition.

## II

Summary judgment must be granted to a party who demonstrates that "there is no genuine issue as to any material fact and that [the party] is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.Pro.; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Put another way, summary judgment is appropriate where "it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Teamsters Joint Council No. 83 v. CenTra, Inc.,* 947 F.2d 115, 119 (4th Cir.1991) (applying Virginia law).[9]

Central to the disposition of this case is the interpretation and application of the Use Agreement. In this regard, it is settled that the proper interpretation of a contract is a legal question for the court. *Nehi Bottling Co. v. All–American Bottling Corp.,* 8 F.3d 157, 162 (4th Cir.1993). The initial task in resolving a motion for summary judgment based on contract interpretation is "to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face." *Goodman v. Resolution Trust Corp.,* 7 F.3d 1123, 1126 (4th Cir.1993). If an "agreement is complete on its face and is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself ... because the writing is the repository of the final agreement of the parties." *Schneider v.*

*Continental Casualty Co.,* 989 F.2d 728, 731 (4th Cir.1993) (quoting *Lerner v. Gudelsky Co.,* 230 Va. 124, 334 S.E.2d 579, 584 (1985)).[10] Where a material term or provision is ambiguous, however, extrinsic or parol evidence may be relevant to resolve the ambiguity. *Anden Group v. Leesburg Joint Venture,* 237 Va. 453, 377 S.E.2d 452 (1989). But this point is not reached unless the contract is infected with an ambiguity. And on this point, it is important to note that "a contract is not deemed ambiguous merely because the parties disagree as to the meaning of the language they used to express their agreement." *United States v. Moore,* 765 F.Supp. 1251, 1256 (E.D.Va.1991) (citing *Ross v. Craw,* 231 Va. 206, 343 S.E.2d 312, 316 (1986)). Rather, an ambiguity exists only "when language admits of being understood in more than one way or refers to two or more things at the same time." *Amos v. Coffey,* 228 Va. 88, 320 S.E.2d 335, 337 (1984).

These principles govern disposition of this dispute, for as the following discussion reflects, the Use Agreement is free from ambiguity and compels the conclusion that Northwest's lease rights derived from the UTA and expired with the UTA in 1995, with the right to lease the space then reverting to the Authority.

## III

It is undisputed that the federal government holds title to National Airport and that the Authority has leased the airport from the government for a term of fifty years. Northwest must therefore point to a provision in a lease agreement with either the Authority or the federal government that leases the premises at issue here to Northwest for a term extending beyond June 30, 1995. Northwest does not claim to have a direct lease with the federal government. And Northwest concedes that the UTA expired by its own terms

2. Breach of contract—Rent past due.

**9.** Section 19.21 of the Use Agreement provides that the Agreement is to be governed by and in accordance with the law of the Commonwealth of Virginia.

**10.** This principle applies with particular force here since the governing contract contains an incorporation provision, stating that "this Agree-

ment sets forth the entire Agreement between the parties, and ... there are no promises or understandings other than those stated herein." Use Agreement § 19.27; *see Spotsylvania School Bd. v. Seaboard Sur.,* 243 Va. 202, 415 S.E.2d 120 (1992) (holding that evidence of pre-contract discussions of parties was inadmissible where contract was unambiguous and where the contract contained a merger clause).

on June 30, 1995 and that the UTA is not the source of any rights Northwest currently has to premises in the Unit Terminal. Rather, Northwest argues that it leases the space pursuant to the Use Agreement and that its lease is governed by the 2014 expiration date of the Use Agreement. In response, the Authority and Continental contend that the Use Agreement recognized and preserved the terms of Northwest's UTA lease as a surviving agreement, including the expiration date of June 30, 1995. When that agreement expired, argue defendants, the space reverted to the Authority. The issue to be decided, then, is whether the Use Agreement leases space in the Unit Terminal to Northwest after June 30, 1995. All parties agree—despite the numerous depositions taken in this case—that the issue may be resolved on the basis of the Use Agreement's unambiguous language and without recourse to parol evidence. It is, therefore, the language of that Agreement that determines whether summary judgment for either party is appropriate.

The appropriate starting point is the Use Agreement's treatment of all the agreements and leases, such as the UTA, that were in existence at the time the Use Agreement came into being. All such agreements and leases, according to the Use Agreement, "shall be deemed terminated as of [midnight, December 31, 1989] except that the Surviving Agreements . . . shall continue in effect until they expire or are terminated by the Authority or the Airline in accordance with the provisions included in any such Surviving Agreements." Use Agreement § 2.03.1. So, except for certain specifically listed exceptions, all agreements and leases in effect at the time of the Use Agreement's inception were terminated. And the specifically listed exceptions were to continue in effect until by their own terms they either expired or were terminated. The UTA was one of the specifically listed exceptions. Thus, as the Use Agreement makes clear, the UTA survived the Use Agreement's general cancellation

provision and served as the sole source of Northwest's lease rights until it expired by its own terms on June 30, 1995. This conclusion, commanded by the Use Agreement's unambiguous terms, flatly contradicts Northwest's central contention that as of January 1, 1990, its lease rights derived from the Use Agreement, not the UTA. The opposite is the case. And because the UTA has expired, the Unit Terminal lease rights reverted to the Authority and therefore Northwest must now seek new lease rights from the Authority under the Use Agreement.

This conclusion also finds support in the absence of any Use Agreement provision purporting to lease Unit Terminal space to Northwest. This is important for it is the heart of Northwest's position that the Use Agreement is and has been the source of its Unit Terminal rights from January 1, 1990 through today and continuing until 2014. Yet, this position is fatally flawed, for nowhere does the Use Agreement bestow those rights on Northwest. Were it to have done so, one might reasonably expect to find such a grant of rights in the Use Agreement's operative lease provision of § 6.01. But a search of that provision yields no support for Northwest. Section 6.01 provides that "[t]he Authority . . . hereby leases to the Airline . . . commencing on the date hereof and subject to all of the terms and conditions herein . . . the [premises and equipment] specifically described and identified as [Temporary Airline Premises] [11] in [Exhibit N–B]." Section 6.01, then, leases only the space specifically described and identified in Exhibit N–B. Exhibit N–B is actually made up of six separate exhibits: Exhibits N–B–1, N–B–1A, and N–B–1B, which relate to Existing/Transition Premises, and Exhibits N–B–2, N–B–2A, and N–B–2B, which relate to Premises Upon Completion of the CDP. Only Exhibit N–B–1A specifically describes and identifies space leased to various airlines. For a given airline, that exhibit lists specific rooms, offices, and other space identified by reference to Exhibit N–B–1 which is a detailed floor plan

---

**11.** Temporary Airline Premises, or TAP, are defined as "those Premises that are temporarily occupied by the Airline pursuant to Article 5 during the course of the Capital Development Program." All premises currently occupied by the airlines are temporary. Leasing of some permanent premises will begin, pursuant to § 6.02, on the date of Substantial Completion of the New North Terminal, which corresponds to the commencement of Phase II.

of the airport. N–B–1A also lists the square footage of each room, the rental rate per square foot, and the airlines total annual and monthly rent for its leased premises. Significantly, Exhibit N–B–1A nowhere lists any entries for premises leased to either Northwest or TWA. Nor are the nine gates and the related space at issue listed in the exhibit. This omission confirms the conclusion that the Unit Terminal space was not and is not leased pursuant to § 6.01 of the Use Agreement.[12] Instead, as Exhibit N–B–1B's language confirms, "airline premises covered by . . . surviving agreements are not reflected in Exhibits N–B–1 and N–B–1A, but will be added to those exhibits upon the expiration or termination of such agreements." This provision makes clear that Northwest did not lease its Unit Terminal space by way of § 6.01 and Exhibit N–B–1A; instead, the premises were leased under the UTA, a surviving agreement, and the Use Agreement makes clear in N–B–1B that when the surviving agreement expires these premises must be added to the pool of space that the Authority can allocate to the various airlines. Significantly, no provision in the Use Agreement requires the Authority to lease the premises to the same airline that

was previously leasing the space under the surviving agreement.[13]

The conclusion that Northwest held a lease pursuant to the UTA rather than the Use Agreement is further supported by a review of Amendment 5 to the UTA. That amendment, which reflected Northwest's 1991 acquisition of TWA's Unit terminal rights, provided that "TWA has assigned all of its rights, title, and interests in the *Unit Terminal Agreement* to Northwest" (emphasis added). This language plainly states that TWA's and Northwest's leases to the premises at issue were made pursuant to the UTA, not the Use Agreement. Indeed, the very fact that it was the UTA that was amended, rather than the Use Agreement, compels the conclusion that TWA's lease was held pursuant to the UTA.[14]

■ In sum, the UTA, not the Use Agreement, was the source of Northwest's Unit Terminal rights, which rights expired with the UTA on June 30, 1995. Thereafter, those rights reverted to the Authority in accordance with Exhibit N–B–1B's provision that "premises covered by surviving agreements . . . will be added to [Exhibit N–B–1A]

12. Seeking to avoid this conclusion, Northwest contends that the space at issue was not listed explicitly in N–B–1A because it was rented to Northwest and TWA based on a different rent structure and it would have been "non-sensical and inappropriate" to reference such space in N–B–1A. This argument is unpersuasive. If in fact Northwest's premises were leased pursuant to the Use Agreement, albeit at a different rental rate, it would have been a simple matter to have included those premises in Exhibit N–B–1A with a number under the "Rental Rate per Square Foot per Annum" column different from the number appearing in the Rental Rate columns of other airlines. Such a listing would hardly have been "nonsensical and inappropriate."

13. American Airlines, which leased certain premises pursuant to another surviving agreement, did in fact receive a lease from the Authority for the same premises upon the expiration of its surviving agreement. But American did not receive that lease as a matter of right; rather, the Authority made a review, pursuant to Article 17 of the Use Agreement, of the space American required for its level of operations at National and concluded, in an exercise of its discretion, that the Airline needed all the space it had been leasing under the surviving agreement. Significantly, American was using all of its leased space

for its own operations. By contrast, Northwest uses only four of its nine gates for its own operations and had subleased the remaining five gates.

14. Also, the second "WHEREAS" clause to Amendment 9 to Northwest's Use Agreement, by which Northwest subleased Gates 5–7 to Continental, makes explicit that Northwest's rights to those gates expired in 1995. The clause states:

WHEREAS Northwest leases certain Premises, including Gates 5, 6, and 7 and related premises, at [National] from the Authority under the terms of this Use Agreement and Premises Lease which in turn recognizes [the UTA] (hereinafter referred to as the "Surviving Agreement") under which Northwest originally leased Gates 5, 6, and 7, and which gives Northwest certain rights in said gates through June 30, 1995, at which time said rights expire.

Northwest contends that the portion of the clause stating that Northwest leases the Gates "under the terms of" the Use Agreement supports its position. Read in context, however, the language merely reflects that the UTA is recognized in the Use Agreement as a surviving agreement and that the Unit Terminal space would be subject to certain provisions in the Use Agreement even during the "survival" period of the UTA.

upon the expiration or termination of such agreements." Moreover, this reversion is consistent with the axiomatic principle that the lessee, upon the expiration of the lease, is bound to deliver up the possession of the premises to the lessor,[15] as well as the Use Agreement's specific provision that "[a]ll rights not specifically granted to the Airline by this Agreement are reserved to the Authority." Use Agreement § 19.01. So upon expiration of the UTA, the Authority was entitled to lease the Unit Terminal space in accordance with the Article 17 of the Use Agreement. It offered to lease Gates 1–4 and the baggage make-up area in the Unit Terminal to Northwest in a letter dated September 11, 1995, but Northwest rejected the lease. Northwest nonetheless continues to occupy the baggage make-up area and to pay rent to the Authority. Accordingly, Northwest is properly considered to be a tenant at sufferance, for as the Use Agreement itself provides in § 15.03:

> In the event the Airline holds over, refuses, or fails to give up the possession of the ... relevant portion of Premises ... in *the event of expiration or termination of the lease for said portion*, ... the Airline shall have only the status of a tenant at sufferance....

And that section goes on to grant the Authority the right in such circumstances to reenter and take possession of the premises, and it may lease the space to other airlines or to Northwest in accordance with the provisions of the Use Agreement.

Northwest objects to this interpretation of the Use Agreement, claiming that such an interpretation would render various portions of the Use Agreement superfluous, in viola-

tion of the canon of contract interpretation that a contract should be construed so as to give meaning to all of its provisions. *See, e.g., Ross v. Craw,* 231 Va. 206, 343 S.E.2d 312 (1986). Northwest points to § 6.01 which provides that "[t]he Authority ... *hereby leases* to the Airline, and the Airline ... *hereby leases* from the Authority ... [various Premises and Equipment]" (emphasis added). The Use Agreement, Northwest points out, speaks in the present tense, about a lease commencing on January 1, 1990, not a lease to commence on June 30, 1995. If Northwest's lease to premises were held pursuant to the Use Agreement and not the UTA, argues Northwest, § 6.01 would be mere surplusage. This argument fails because it views the scope of the contract too narrowly; § 6.01 applies to more than the Unit Terminal space. Thus, the Use Agreement governs the rights and obligations of the airlines and the Authority at Dulles, as well as at National, including leasing Dulles space to the airlines. Accordingly, effective January 1, 1990, Northwest leased premises at Dulles from the Authority pursuant to § 6.01 of the Use Agreement. Moreover, § 6.01 even applied to Northwest's lease of some space at National other than the Unit Terminal.[16] So, contrary to Northwest's contention, the Use Agreement construction adopted here does not make § 6.01 mere surplusage.

Northwest next points out that § 6.01 refers to Exhibit N–B, which is made up of six separate exhibits, and argues that it leases the relevant premises as TAP pursuant to portions of Exhibit N–B other than N–B–1A.[17] Specifically, Northwest contends that the Unit Terminal space is included in § 6.01

---

**15.** *See, e.g., Corporation of the Catholic Bishop of Nesqually v. Gibbon,* 158 U.S. 155, 170, 15 S.Ct. 779, 785, 39 L.Ed. 931 (1895) ("The contract of lease implies ... a promise to surrender the possession to the [lessor] on the termination of the lease."); *Rice v. Atkinson–Deacon–Elliott Co.,* 215 Mich. 371, 183 N.W. 762 (1921) ("It is a covenant either express or implied of all leases for a definite period of time that the tenant at the expiration of his lease will yield and deliver up the possession of the premises to the landlord.").

**16.** A more general yet related argument of Northwest is disposed of by similar reasoning. Northwest argues that defendants' construction of the contract yields the result that on July 1,

1995, Northwest was in exactly the same situation it would have been in had it not signed the Use Agreement at all. Not so, for the lease of premises at National is not the sole purpose of the Use Agreement; it also grants Northwest the right to take off from and land at National, to install radio and navigational equipment there, to sell tickets there, and more. *See generally* Use Agreement Article 4. And, of course, the Use Agreement also gave Northwest the right to use and lease space and equipment at Dulles.

**17.** Northwest does not argue that it has Permanent Premises pursuant to 6.02. The space at issue would not become Permanent Premises until Phase V of the CDP.

by way of Exhibits N–B–1B and N–B–2B. Neither exhibit can bear the weight Northwest places on it.

Exhibit N–B–1B, entitled "Narrative on Existing/Transition Premises," generally discusses the Use Agreement's relocation and reallocation provisions of Articles 5, 16, and 17 during the period "prior to the completion of the CDP and the designation of all airline premises as Permanent Airline Premises." Because the exhibit makes a reference to "Premises Related to Surviving Agreements," Northwest reasons that such premises must constitute a portion of "all airline premises" to which Articles 5, 16 and 17 are applicable. If the Unit Terminal space were leased under the UTA, Northwest contends, § 19.08 of the Use Agreement, which allows the surviving agreement to govern where there is a conflict between it and the UTA, would apply and so the Authority would not have the relocation and reallocation rights as to Unit Terminal space. Because the exhibit indicates that the relocation and reallocation provisions apply to Northwest's Unit Terminal space, Northwest concludes that its Unit Terminal space must be leased under the Use Agreement and not the UTA. This convoluted argument fails for two reasons. First, the reference in Exhibit N–B–1B to premises related to surviving agreements does not demonstrate that those premises are included in the premises subject to Articles 5, 16 and 17. Indeed, the exhibit indicates the opposite when it states that "premises covered by such surviving agreements are not reflected in Exhibits N–B–1 and N–B–1A but will be added to those exhibits upon the expiration or termination of such agreements." Second, nothing in Exhibit N–B–1B identifies and describes any leased premises with the degree of specificity required by § 6.01. Exhibit N–B–1B does not

support the conclusion that Northwest leased the Unit Terminal space under the Use Agreement rather than the UTA.

Nor does Exhibit N–B–2B warrant a different conclusion. Northwest contends that the allocation shown in that exhibit was "guaranteed" to the Airlines, whereas defendants argue that the exhibit merely reflects an initial assessment of how gates would be allocated at various phases of the CDP. A careful review of Exhibit N–B–2B reveals little that reflects a promise or guarantee; at most, it reflects no more than an initial estimate of the allocation of gates to airlines throughout the CDP. And Exhibit N–B–2B does not "specifically describ[e] and identif[y]" any Unit Terminal space as Temporary Airline Premises, as required by section 6.01; it merely places an airline's initials next to certain gates. Missing is the detailed and specific lease of particular rooms, corridors, etc. reflected in N–B–1A. In short, Exhibit N–B–2B does not serve as the source of a lease of Unit Terminal space to Northwest pursuant to § 6.01 of the Use Agreement.[18]

Finally, Northwest argues that by tendering the lease to Gates 1–4 and the baggage make-up area in the letter of September 11, 1995, the Authority leased the premises to Northwest. Because Northwest was already a signatory to the Use Agreement, Northwest contends, no other action was required to effect the lease of the premises identified in the exhibit attached to the Authority's letter. Specifically, no acceptance was required. This position ignores § 6.05 of the Use Agreement, entitled "Modification of Premises," which provides for the modification of leased premises only "by mutual agreement." Indeed, it would be an odd contract that allowed the Authority unilaterally to impose a lease on a signatory airline. By letter dated September 21, 1995, North-

---

**18.** Northwest invites the Court to scour the voluminous documents and transcripts of depositions in this case in search of extrinsic evidence which "guaranteed" to the Airlines the allocation reflected in Exhibit N–B–2B. A review of that evidence reflects, at best, that signatory airlines were guaranteed the initial allotment of gates in exhibit N–B–1A and the surviving agreements, but that any future gate allocations remained uncertain. In other words, this material, at most, reflects no more than what the Use Agreement provides, namely that airlines with surviving agreements were guaranteed a lease of those

premises covered by the surviving agreement until the agreement expired or was terminated. In any event, to the extent that the summary judgment record contains any indication of a guarantee as to future gate allocations, Northwest may not rely on extrinsic evidence that contradicts the Use Agreement's unambiguous provisions, which contain no such guarantee. *See Schneider v. Continental Casualty Co.*, 989 F.2d 728, 731 (4th Cir.1993) (holding that extrinsic evidence cannot be invoked to create an ambiguity in an otherwise unambiguous contract) (citing *Cohan v. Thurston*, 223 Va. 523, 292 S.E.2d 45, 46 (1982)).

west explicitly rejected the proposed modification. Because there was no mutual agreement, Northwest does not currently hold a lease to the space it occupies in the Unit Terminal; it is a tenant at sufferance.

## IV

Northwest raises another issue that is independent of whether it held a lease to the Unit Terminal space on July 1, 1995. Paragraph 5 of Amendment 5 to the UTA, which reflected TWA's assignment of its rights in the Terminal to Northwest, states that "It is understood the Premises in Article I are not subject to reallocation in accordance with Article 17 of the [Use Agreement] and that said Article 17 otherwise applies in all respects." Northwest argues that by that paragraph, the Authority expressly exempted Northwest from the operation of § 17.02. This argument fails for two reasons. First, even if that language had the effect Northwest claims it does, the UTA expired in 1995, and so Amendment 5 to the UTA has no effect after June 30, 1995. Section 17.02 therefore now plainly applies to Northwest. But beyond this, Northwest has simply misinterpreted the meaning of paragraph 5. The Authority did not waive its reallocation rights. Rather, paragraph 5 merely recited the understanding of the three parties— Northwest, TWA, and the Authority—of the effect of the two agreements. The UTA, as amended, gave Northwest the rights to nine gates through June 30, 1995. But the Use Agreement allowed the Authority to reallocate space nine months prior to substantial completion of the new terminal, which was expected to occur before June 30, 1995. Thus a conflict existed. Paragraph 5 of the Amendment to the UTA simply recognized that, pursuant to § 19.08 of the Use Agreement, the terms of the UTA governed where such a conflict existed until the expiration of the UTA. Once the UTA expired, any conflict with the Use Agreement evaporated and paragraph 5 ceased to have any effect. Instead, the premises reverted to the Authority and § 17.02 once again governed the premises.

## V

Finally, at issue is the status of the support services agreement between Northwest and Continental. Continental gave Northwest notice of its intent to terminate the contract effective January 20, 1996. The parties then agreed to extend the contract period until February 20, 1996. After that date, however, Continental continued to make use of Northwest's services in the baggage handling area, and it has continued to pay Northwest the contract rate for such services. Northwest argues that Continental's continued use of Northwest's services rendered the notice of termination ineffective and that the contract continues in full force. In support, Northwest cites *United States v. Maryland Casualty Co.*, 146 F.2d 379 (5th Cir.1944) for the proposition that "[a]n assertion of the termination of a contract may be nullified by the subsequent acceptance of benefits growing out of the contract." *Id.* at 381. In response, Continental argues that because Northwest has refused to provide Continental with access to the space and equipment necessary to handle its own baggage Continental has had no choice but to continue using Northwest's services. Given this, Continental's continued acceptance of the benefits of the support services agreement is not inconsistent with its notice of termination.

On the record before the Court, it is unclear whether Continental had a practicable alternative to continuing to make use of Northwest's services. At the hearing on Continental's earlier motion for a preliminary injunction, the parties indicated that Continental might be able to convert other space it leases from the Authority into its own baggage make-up area, install its own equipment, and handle its own baggage. If this is true, then Continental had a practical alternative to continuing under the agreement. In this event, Continental's continued use of Northwest's services might well nullify its notice of termination of the support services agreement. If, on the other hand, Continental had no access to any other area that could feasibly serve as a baggage make-up area, and had no alternative but to continue to use Northwest's services, then its notice of termination might well be effective. Which of these circumstances is true is not evident from the current record. Accordingly, it is

not possible to resolve this factual dispute on the basis of the current record, summary judgment on the issue of the support services agreement is not possible at this time.

## VI

In sum, the Use Agreement unambiguously provides that Northwest's lease rights to the gates and baggage make-up area in the Unit Terminal derived from the UTA and not from the Use Agreement, and that those lease rights expired on June 30, 1995, after which date Northwest no longer held any lease rights to the premises. Because Northwest continued to occupy the Unit Terminal after that date and because it rejected the lease offered by the Authority pursuant to the Use Agreement, Northwest is a tenant at sufferance as to the Unit Terminal space. Continental accepted the lease offered to it by the Authority for Gates 5–7, and accordingly directly leases those premises from the Authority. The Authority may, in accordance with the Use Agreement, lease the baggage make-up area to one or more airlines and may require the airline or airlines to accommodate other airlines in the use of that space.