**TREX COMPANY, INC., and Trex Company, LLC, Plaintiffs,**

v.

**EXXONMOBIL OIL CORPORATION, Defendant.**

No. CIV.A. 02–529–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 10, 2002.

Wendy Anderson Terry, Hale and Dorr, Washington, DC, for Plaintiffs.

Mark Allison Miller, Baker & Botts, The Warner, Washington, DC, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this diversity declaratory judgment action, the parties to a transaction involving the sale of a business dispute whether a particular patent infringement suit is a liability retained by the seller or one assumed by the purchaser. At issue on summary judgment is the interpretation of provisions in the parties' Asset Purchase Agreement (the Agreement) that define the "excluded liabilities" that were to remain the seller's responsibility. Plaintiff contends that the patent infringement suit falls squarely within the defined "excluded liabilities," whereas defendant argues that the "excluded liabilities" are limited to claims against ExxonMobil for actions prior to the sale, which the patent infringement suit is not.

---

**1.** In November 1999, Exxon and Mobil merged into a single entity named ExxonMobil Oil Corporation. For simplicity, the defendant is referred to as ExxonMobil throughout.

## I.

The dispositive facts are not disputed. On August 29, 1996, ExxonMobil Oil Corporation (hereinafter "ExxonMobil"), then known as Mobil Oil Corporation,[1] sold one of its divisions to the newly-formed Trex Company, LLC for approximately $30 million.[2] This division manufactured and distributed wood-polymer composite products for decking and outdoor use. The Agreement transferred most of the assets of ExxonMobil's Composite Products Division to Trex, and Trex assumed all of the liabilities related to the business division it purchased, except for certain specified excluded liabilities. In question is whether these excluded liabilities include a claim filed in the Eastern District of Virginia on December 5, 2001 by Ron Nystrom against Trex Company, Inc. and Trex Company, LLC (hereinafter referred to collectively as "Trex"), alleging infringement of Patent No. 5,474,831 (the '831 patent).[3]

The Agreement provisions regarding the excluded liabilities are as follows: In § 2.3, the purchaser, Trex, agrees to

> assume . . . all debts, liabilities and obligations whatsoever, *other than the Excluded Liabilities,* that arise out of or are Related to the Business or that otherwise arise out of or are Related to the Transferred Assets, whether arising before or after the Closing and whether known or unknown, fixed or contingent
> . . . .

Agreement, § 2.3 (emphasis added). Section 2.4, In turn, defines the Excluded Liabilities as including, in part,

---

**2.** Trex was formed by former employees of the division.

**3.** *See Nystrom v. Trex,* Civil Action No. 2:01–905 (E.D.Va. December 5, 2001) (Complaint).

all liabilities *arising out of* the suits, proceedings, disputes, claims or investigations identified in Schedule 2.4(c).

Agreement, § 2.4(c) (emphasis added).

Schedule 2.4(c) identifies three items. The first two items, listed under the heading "Excluded Litigation," are matters that were already in litigation at the time of the Agreement: (i) *Mobil Oil Corp. v. Advanced Environmental Recycling Technologies, Inc.* (the AERT case), and (ii) *Mobil Oil Corp. v. Craymatt, Inc., and Enviropro, Inc.* (the Craymatt case).[4] The third item on the schedule, listed under the heading "Excluded Claims," is the claim by Ron Nystrom, which is relevant to the matter at hand:

> Patent infringement claim brought by Mr. Ron Nystrom of Supreme Decking Inc. against Mobil Oil Corporation on February 8, 1996 regarding U.S. Patent No. 5,394,667 and No. 5,474,831.

Agreement, Schedule 2.4(c).

The Agreement specifically provides that ExxonMobil shall indemnify Trex for "Losses ... relating to or arising out of" any of the "Excluded Liabilities." Agreement, § 7.3. And, finally, "Losses" is broadly defined to include

> ... any damages, claims, losses, charges, actions, suits, proceedings ... and reasonable costs and expenses (including, without limitation, reasonable attorneys' fees ...) ... (collectively, the "Losses") ....

Agreement, § 7.2(a); *See also* § 1.1 ("*'Losses'* shall have the meaning set forth in Section 7.2(a).")

The Nystrom claim against Trex, which is the subject of this dispute, commenced with a March 18, 1999 letter, in which Nystrom's lawyer accused Trex of violating Nystrom's '831 patent. The letter threatened litigation and invited Trex to negotiate a license under the Nystrom patent. Just as ExxonMobil had done in response to earlier claims by Nystrom against ExxonMobil regarding infringement of the same patent, Trex responded by denying infringement and offering a nominal settlement. A meeting to discuss settlement on July 7, 1999, was unsuccessful. The matter then remained dormant until February 20, 2001, when Nystrom's lawyer again contacted Trex regarding the '831 Patent. After again refusing a nominal settlement offer, Nystrom filed suit against Trex in the United States Court for the Eastern District of Virginia on December 5, 2001.[5] On December 19, 2001, Trex notified ExxonMobil of the claim by sending a facsimile copy of the complaint to ExxonMobil. Three months later, on March 12, 2002, Trex formally requested that ExxonMobil indemnify Trex for the costs incurred in defending the suit. Although a judgment of no infringement was entered on October 25, 2002,[6] the fees and costs Trex incurred in defense apparently reached seven figures

---

4. ExxonMobil assumed full responsibility for defending the AERT and Craymatt cases. The AERT case also involved patent infringement, and sought both damages and an injunction against future infringement. Although it began well before the 1996 Asset Purchase, the AERT case finally concluded when AERT's motion for a new trial was denied on September 9, 1999. ExxonMobil prevailed on all claims. The Craymatt case involved various claims regarding contractual

rights to sales territories, unfair trade practice, and antitrust and franchise practice violations. It, too, involved a request for damages and injunctive relief, and was resolved by settlement agreement in September 2000, well after the 1996 Asset Purchase.

5. *See Nystrom v. Trex*, Civil Action No. 2:01–905 (E.D.Va. December 5, 2001) (Complaint).

6. *See id.*, October 25, 2002 (Judgment).

and the matter is ongoing. Nystrom filed a notice of appeal on November 12, 2002.[7]

The instant action between Trex and ExxonMobil commenced with a complaint, filed by Trex on April 12, 2002, alleging that ExxonMobil had breached its obligation to indemnify Trex for the Nystrom suit.[8] In the complaint, Trex requested both a declaration that ExxonMobil was obligated to indemnify Trex for the Nystrom litigation, and an order directing ExxonMobil to pay the expenses incurred until such time as ExxonMobil takes over the defense of the claim. On September 9, 2002, Trex filed a motion for summary judgment on all claims in its complaint, and ExxonMobil responded on September 20, 2002 by filing a cross motion for summary judgment. Following a hearing on the motions on October 11, 2002, the matter was taken under advisement. The parties filed a set of stipulated facts and supplemental briefs regarding the AERT and Craymatt cases and the extrinsic evidence applicable in the event the governing contract language is determined to be ambiguous.

## II.

The governing Virginia legal principles[9] are well-settled and not seriously disputed: Resolution of a contract interpretation dispute on summary judgment requires a two-step analysis. First, a determination must be made as to whether the dispositive contractual language is ambiguous or unambiguous on its face. *See World–Wide Rights Limited Partnership v. Combe,* 955 F.2d 242, 245 (4th Cir.1992). If the contract is unambiguous, the inquiry is at an end, and the contract must be enforced as it reads. *See id.* Virginia law specifically requires that if the contract is "plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." *Foothill Capital Corp. v. East Coast Building Supply Corp.,* 259 B.R. 840, 845 (E.D.Va.2001). Nor are courts "at liberty to rewrite the contractual language," even if the plain language of the contract produces what "some may consider a harsh result." *Id.* Importantly, the mere fact that the parties dispute the meaning of the language does not itself render the contract ambiguous.[10] *Northwest Airlines v. Metropolitan Washington Airports Authority,* 924 F.Supp. 704, 708 (E.D.Va. 1996). Were the parties' dispute over language to be the test for the existence of ambiguity, lawyers' sophistry would likely render unambiguous contracts extinct. Instead, the more sensible rule is that the contract is ambiguous only if the language objectively "admits of being understood in more than one way or refers to two or more things at the same time." *Id.*

The second step in the analysis is reached only in the event the dispositive

---

7. *See id.,* November 12, 2002 (Notice of Appeal).

8. *See Trex v. ExxonMobil,* Civil Action No. 02–529–A (E.D. Va. April 12, 2002) (Complaint).

9. Under the rule in *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), a federal court sitting in Virginia and exercising diversity jurisdiction applies Virginia choice of law rules. Virginia law gives full effect to contractual choice of law provisions, *see Tate v. Hain,* 181 Va. 402, 25 S.E.2d 321 (1943), which in this case

dictates that the Agreement be "governed by, and construed in accordance with" Virginia law. Agreement, § 15.1. Absent this choice of law provision, Virginia law would nonetheless govern, as the interpretation of contracts in Virginia courts is governed by the law of the state where the contract was made. *See Woodson v. Celina Mut. Ins. Co.,* 211 Va. 423, 177 S.E.2d 610 (1970).

10. In this case, in fact, both parties insist the pertinent contract language is unambiguous, despite their opposing interpretations.

contractual language is ultimately found to be infected with ambiguity. In that event, the next step in the analysis is to examine the extrinsic evidence, *i.e.*, the evidence outside the four corners of the contract, to determine which of the competing interpretations correctly reflects the parties' true intent. *See World–Wide Rights*, 955 F.2d at 245. Summary judgment is warranted if the extrinsic evidence included in the summary judgment materials "is, as a matter of law, dispositive of the interpretive issue." *Id.*

According to the Agreement, ExxonMobil retains financial responsibility for the excluded liabilities, which include "all liabilities *arising out of*" the patent infringement claim "brought by Mr. Ron Nystrom . . . against Mobil Oil Corporation on February 8, 1996." Agreement, § 2.4(c); Schedule 2.4(c) (emphasis added). The December 5, 2001 suit filed by Nystrom against Trex is virtually identical to the claim asserted by Nystrom against ExxonMobil and listed in Schedule 2.4(c). Thus, the claim against Trex involves the same plaintiff, Nystrom, making the same claim, infringement of the '831 patent, based on the same activity, the manufacture and sale of composite decking board. The only difference between the two claims is that Trex has been substituted for ExxonMobil, which simply reflects the reality that the composite decking business that allegedly infringed the patents was transferred from ExxonMobil to Trex.[11] Furthermore, there is no evidence that the allegedly infringing product changed in any significant way after the transfer. In sum, then, the Nystrom suit against Trex is merely a continuation of the earlier Nystrom patent infringement claim against ExxonMobil, with only the defendant changed to reflect the transfer of the allegedly infringing business. Given this close nexus between the two claims, the next step in the analysis is to consider whether the Nystrom suit against Trex is a claim "arising out of" the earlier Nystrom claim listed in the Agreement as an excluded liability.

The phrase "arising out of" is not itself ambiguous and has a plain meaning that is not difficult to discern. In the insurance context "arising out of" is broader than "caused by," and ordinarily means "originating from," "having its origin in," "growing out of," "flowing from," or "incident to or having connection with." *St. Paul Fire and Marine Insurance Co. v. Insurance Company of North America*, 501 F.Supp. 136, 138 (W.D.Va.1980) (applying Virginia law) (citing *Red Ball Motor Freight v. Employers Mutual Liability Ins. Co.*, 189 F.2d 374, 378 (5 Cir.1951) (applying Texas law)).[12] Similarly, in determining the scope of the phrase "arising out of or related to" as used in arbitration clauses, the Fourth Circuit held that the proper test is whether the claim "has a significant

---

**11.** One other difference between the claims is that Patent No. 5,394,667, listed in the Schedule 2.4(c) description of the claim, was not ultimately pursued in the Nystrom suit against Trex in this district. *See Nystrom v. Trex*, Civil Action No. 2:01–905 (E.D.Va. December 5, 2001) (Complaint). Neither party contends that this difference is significant.

**12.** Interpretations of "arising out of" in the insurance context are generally in agreement, regardless of which state law governs. *See, e.g., Troutt v. Colorado Western Ins. Co.*, 246 F.3d 1150, 1160 (9th Cir.2001) ("having a

connection with") (applying Montana law); *Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 7 (1st Cir. 2000) ("originating from," "growing out of," "flowing from," "incident to," "having connection with") (Massachusetts); *Federal Ins. Co. v. Tri–State Ins. Co.*, 157 F.3d 800, 804 (10th Cir.1998) ("originating from," "growing out of," "flowing from," "done in connection with") (Oklahoma); *United Nat. Ins. Co. v. Penuche's, Inc.*, 128 F.3d 28, 32 (1st Cir.1997) ("originating from," "growing out of," "flowing from") (New Hampshire).

relationship to" the subject of the arbitration clause. *American Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir.1996).[13] Although the present case does not involve either a commercial insurance contract or an arbitration clause,[14] these cases interpreting the language in other contexts nonetheless shed light on the plain meaning of the "arising out of" language chosen by the parties. Indeed, the Fourth Circuit has held that the use of the phrase "arising out of" in a similar context, namely a settlement agreement between two commercial entities releasing all claims "arising out of" certain listed claims, clearly indicated an intent that the release be broadly construed and not be strictly limited to the listed released claims. *See Coakley & Williams Constr., Inc. v. Structural Concrete Equip., Inc.*, 973 F.2d 349, 352–353 (4th Cir.1992).

In short, the plain meaning of "arising under," whether interpreted as meaning "originating from," "flowing from," "having connection with," "significantly related to," or any other plausible interpretation, is clearly broad enough to encompass the Nystrom patent infringement suit against Trex. As in *St. Paul Fire*, 501 F.Supp. at 139, it is not necessary to "define the outer perimeter" of the scope of the phrase "arising under" in this context to conclude that it is certainly broad enough to include the matter at issue. After all, the Nystrom suit against Trex is a direct continuation of the earlier claim against ExxonMobil and is virtually identical to it. It follows, therefore, that the Nystrom suit against Trex clearly "arises out of" the claim against ExxonMobil listed as an excluded liability in Schedule 2.4(c). It further follows, ineluctably, that the Nystrom patent infringement suit against Trex is an "excluded liability" under § 2.4(c), for which ExxonMobil must indemnify Trex pursuant to § 7.3.

ExxonMobil does not seriously dispute the unambiguous plain meaning of "arising out of," but argues instead that because the Nystrom claim listed in the Agreement is against ExxonMobil, only claims against that entity can arise from it. Therefore, according to ExxonMobil, the Nystrom patent infringement suit *against Trex* is not an excluded liability. In support of this claim, ExxonMobil relies on *Seaboard Air Line Railroad Co. v. Richmond–Petersburg Turnpike Authority*, 202 Va. 1029, 121 S.E.2d 499 (1961). In *Seaboard,* the Virginia Supreme Court held that an agreement indemnifying the Railroad for any "damage, loss, or injury . . . arising out of, or happening in connection with the *operation, use, and maintenance*" of a bridge built by the Authority, *id.* at 1030, 121 S.E.2d 499 (emphasis added), did not cover damage caused by pigeons roosting on the bridge because such losses were not connected with the "operation, use and maintenance" of the bridge. *Id.* at 1034,

---

**13.** In the arbitration context, the scope of the phrase "arising out of or related to" is broader than the scope of "arising out of." *See Am. Recovery*, 96 F.3d at 93. Significantly, § 7.3 requires indemnification for losses "relating to or arising out of" the excluded liabilities.

**14.** ExxonMobil contends that these broad definitions of "arising out of" reflect federal policy favoring arbitration, *see American Recovery*, 96 F.3d at 92, and Virginia policy favoring greater coverage for the insured, *see St. Paul Fire*, 501 F.Supp. at 138, neither of which is applicable in this case. However, ExxonMobil does not suggest a different definition of the "arising out of" phrase which would not encompass the Nystrom suit; given the close relationship between the Nystrom suit against Trex and the listed claim, such a definition would be implausible. Instead, ExxonMobil asserts that the scope of the excluded liabilities is limited by a specific requirement independent of the "arising out of" phrase.

121 S.E.2d 499. If the parties had intended to include any losses caused by the existence of the bridge, the Virginia court concluded that they would have chosen broader language. *Id.* ExxonMobil contends that the phrase "against Mobil Oil Corporation" serves in a similar manner, namely to limit the excluded liabilities under the Agreement to claims which are brought "against Mobil Oil Corporation."

ExxonMobil's interpretation is not a plausible reading of the relevant contractual provisions. First, ExxonMobil confuses the functions of Schedule 2.4(c) and § 2.4(c). Schedule 2.4(c) identifies three particular matters, the AERT case, the Craymatt case, and the Nystrom claim, while § 2.4(c) defines the excluded liabilities as including, in part, "all liabilities arising out of" the these three particular matters. Thus, the phrase "against Mobil Corporation" in Schedule 2.4(c) serves to identify the particular claim listed in the schedule, not, as ExxonMobil contends, to modify or limit the scope of the "arising out of" liability established by § 2.4(c). Thus, this case is clearly distinguished from *Seaboard*, in which the phrase "operation, use and maintenance," when read in its natural and intended sense, does serve to limit the scope of the indemnification.

Second, ExxonMobil has seized on the "against Mobil Oil Corporation" phrase and given it undue significance which is unsupported by the plain language of the contract.[15] For example, ExxonMobil does not, and could not, plausibly, claim that the excluded liabilities are limited to those claims brought "on February 8, 1996."[16] Nor does ExxonMobil argue that the Nystrom suit against Trex is not an excluded liability because it involves only the '831 Patent, not both the '667 and '831 Patents as the listed claim does. Furthermore, if Nystrom sold his intellectual property rights to another party, which then sued Trex or ExxonMobil for infringement of the same patent, it would hardly follow that such a claim would not be an excluded liability simply because it was not "brought by Mr. Nystrom." Therefore, it is implausible to assert that the phrase "against Mobil Oil Corporation," occurring undifferentiated amidst those phrases, has a special limiting function which the other phrases lack. Instead, the phrase "against Mobil Oil Corporation" clearly serves the same purpose as the other details included in the description of the Nystrom claim, namely it merely identifies the particular claim intended to be listed in the schedule; it does not limit the scope of the "arising out of" language in § 2.4(c).

In sum, it is clear that the Nystrom patent infringement suit against Trex "arises out of" the listed Nystrom claim against ExxonMobil, and is therefore an "Excluded Liability" under § 2.4(c). It follows that ExxonMobil is obligated by the Agreement to indemnify Trex, pursuant to § 7.3, for any losses "relating to or arising out of" the Nystrom claim against Trex.[17]

---

**15.** To justify this emphasis, ExxonMobil relies on the fact that all three listed claims include Mobil Oil Corporation as a party. This fact is unsurprising, however, given that when the Agreement was prepared Trex had not yet taken control of the business, and therefore would not be named in any then-current claim against the business.

**16.** Indeed, ExxonMobil admits that this date, which is the date of a letter from ExxonMobil responding to a Nystrom letter, could not be the date on which Nystrom's claim was brought. ExxonMobil states, however, that this error is "of no significance."

**17.** Even assuming, *arguendo*, the plausibility of ExxonMobil's narrow reading of "arising out of" and that the contract was, therefore, ambiguous, a consideration of the extrinsic evidence concerning the intended meaning of the contract would not alter the result

## III.

Given that ExxonMobil is contractually obligated to indemnify Trex for the Nystrom claim, two questions remain. First, did Trex lose its right to indemnification by failing to notify ExxonMobil promptly of the Nystrom claim, pursuant to the terms of the Agreement? And second, did Trex waive its right to indemnification by defending the Nystrom claim on its own for some time before demanding indemnification? Each question is separately addressed.

### A.

■ Section 7.4 of the Agreement requires notification of the indemnifying party by the indemnified party within 15 days of receipt of *"any written claim or demand* for which" the indemnifying party would be liable. Agreement § 7.4 (emphasis added). Importantly, however, lack of notice absolves the indemnifying party of its obligations only *"to the extent* that such delay *actually prejudiced* its ability to defend or contest the matter." *Id.* (emphasis added).

According to the record, it appears that Nystrom's counsel notified Trex in a March 18, 1999 letter that Trex's products "may infringe" Nystrom's '831 patent. Nystrom offered to license his patent to Trex and suggested that, absent a license, Trex would be subject to a patent infringement suit.[18] Yet, despite this receipt of a "written claim or demand," Agreement § 7.4, Trex did not notify ExxonMobil concerning Nystrom's claim until December 19, 2001, when a copy of the complaint filed by Nystrom against Trex was sent to ExxonMobil. Although Trex maintains that this notice was timely, since it occurred within 15 days of Nystrom's filing of his complaint against Trex, § 7.4 of the Agreement requires only that the claim or demand be "written," not that it be a formal complaint filed in court.[19] Thus, it appears, strictly speaking, that notice was untimely as Trex failed to notify Exxon-Mobil within 15 days of its receipt of the March 18, 1999 Nystrom letter.

Yet, the analysis does not end here; ExxonMobil must also produce record evidence that it was "actually prejudiced" by Trex's delay in notification. This Exxon-Mobil has failed to do. Although Trex waited to notify ExxonMobil until shortly after Nystrom filed suit in December 2001,

reached here, as the extrinsic evidence, on balance, supports Trex's plain language reading of the contract. The most persuasive extrinsic evidence is the drafting history of § 2.4(c). Although the initial version of § 2.4(c) is virtually identical to the final version, an intermediate draft contains a different provision. The intermediate draft provides, in part, that ExxonMobil retains all liabilities "[r]elated to acts or omissions *occurring prior to the Closing Date* ... including ... those matters specifically identified in Schedule 2.4(c)." Thus, it is clear that the parties considered language limiting Exxon-Mobil's retained liability to claims related to ExxonMobil's own actions prior to the sale, but then ultimately eliminated this language, thereby indicating a rejection of this position. Nor is there any reason to credit ExxonMobil's argument that the phrase "against Mobil Oil Corporation" in Schedule 2.4(c) was in-

tended to have the same effect as the language omitted from § 2.4(c).

**18.** In particular, Nystrom's letter claims that "[o]btaining rights under this patent will certainly provide ... a significant competitive advantage in the decking industry, as well as avoid exposure to a patent infringement action."

**19.** Indeed, the Nystrom claim against Exxon-Mobil is referred to in the Agreement as a "claim," Schedule 2.4(c), even though at the time of the Agreement the Nystrom claim against ExxonMobil had not yet been filed in court, and indeed never was filed. This supports the conclusion that the reference to "claim or demand" in the Agreement is not limited to a formally filed lawsuit.

Trex, in the interim, did nothing more in defense of the claim than write letters denying infringement and offer Nystrom a nominal settlement. None of this activity prejudiced ExxonMobil. For its. part, ExxonMobil, even after receiving notification, took no action apart from denying liability for the Nystrom claim against Trex. Significantly, after receiving notice of.the claim on December 19, 2001, Exxon-Mobil had the right to take over the defense, and would then have had "the sole power to direct and control such defense," yet it chose not to do so.[20]

ExxonMobil contends that the delay prevented it from engaging in settlement negotiations with Nystrom until it was "too late." Yet, ExxonMobil offers no evidence in support of its contention that notification two weeks after the filing of the claim was "too late" for settlement negotiations. Moreover, given ExxonMobil's consistent denial of liability for the Nystrom suit against Trex, ExxonMobil cannot now plausibly argue that it would have settled the matter with Nystrom, if only it had received earlier notice. ExxonMobil further complains that Trex accrued "extraordinary seven-figure legal fees" in defense of the suit; yet, upon receiving notice of the suit shortly after it was filed, Exxon-Mobil did not exercise its right to control the defense. In sum, there is no showing

that the December 19, 2001 notice was too late to allow ExxonMobil to reach a more efficient resolution of the claim, nor that ExxonMobil would have acted differently had it been provided with timely notice of the claim. Therefore, ExxonMobil has failed to show "actual prejudice" caused by Trex's untimely notice, and cannot rely on Trex's late notice to evade its duty to indemnify.[21] .

**B.**

■ ExxonMobil argues that Trex's conduct in defending against the Nystrom claim for some time before notifying ExxonMobil and requesting indemnification operated as a waiver of Trex's right to indemnification. This argument is also unpersuasive.

Under Virginia law, a waiver occurs when "the waiving party voluntarily and intentionally abandon[s] a known legal right." *See Chas. H. Tompkins Co. v. Lumbermens Mutual Casualty Co.*, 732 F.Supp. 1368, 1377 (E.D.Va.1990) (citing *Bergmueller v. Minnick*, 238 Va. 332, 383 S.E.2d 722 (1973)). It appears from the uncontradicted record that Trex delayed asserting its right to indemnification not because it "voluntarily and intentionally abandoned" that right, but because it inadvertently and briefly overlooked its contractual indemnification right.[22] More-

---

**20.** In addition, ExxonMobil was obligated to inform Trex within 60 days after notification (or until 5 days before the first response to the claim is required, whichever is shorter) whether ExxonMobil (a) "disputes the liability" or (b) "desires to defend the indemnified party."

**21.** In a footnote to its Cross Motion for Summary Judgment, ExxonMobil also sketches out a claim that Trex is estopped from asserting its indemnification right due to its silence or inaction in the face of its duty to notify. However, without a showing of prejudice or reliance, ExxonMobil cannot rely on an estoppel theory. *See Sink v. Commonwealth of*

*Virginia*, 13 Va.App. 544, 548, 413 S.E.2d 658 (1992) ("An element of estoppel is that the party asserting the estoppel must have acted upon the conduct of the other party.").

**22.** By coincidence, an attorney working for the firm representing Trex in defending the Nystrom claim, Allan Weiner, had previously worked for the firm which represented Trex with regard to the asset purchase from ExxonMobil. He eventually made the connection between the Nystrom claim and the excluded claim in the Agreement, which he remembered as the "Supreme Decking" claim, and realized that Trex might have a claim against

over, the Agreement contains language requiring waivers to be "in writing and signed ... by the party against whom the waiver is to be effective." Agreement § 10.2. Under Virginia law, such clauses must be given effect. *See Chas. H. Tompkins,* 732 F.Supp. at 1377 (citing *Chesapeake & Potomac Tel. Co. v. Sisson & Ryan, Inc.,* 234 Va. 492, 362 S.E.2d 723 (1987)).[23] Thus, even if the facts supported an intentional abandonment of the indemnity right, ExxonMobil cannot rely on a waiver defense absent a written waiver signed by Trex. Therefore Exxon-Mobil's waiver defense must fail.

### IV.

In sum, the plain and unambiguous language of § 2.4(c), § 7.3, and Schedule 2.4(c) of the Agreement imposes upon ExxonMobil an obligation to indemnify Trex for its losses incurred in defense on Nystrom's suit against Trex for the infringement of the '831 patent. This language must be enforced according to its plain meaning. Trex's delay in notifying Exxon-Mobil of the claim does not result in the loss of the right to indemnification, either under the contract itself or because of any waiver. Accordingly, an appropriate order will issue declaring that ExxonMobil is obligated to indemnify Trex pursuant to the Agreement for its losses, including fees and expenses, arising out of the Nystrom litigation, and directing ExxonMobil to pay such expenses.

---

ExxonMobil for its costs in defending the Nystrom claim.

**23.** *See also U.S. Broadcasting Co. v. National Broadcasting Co.,* 439 F.Supp. 8, 11 (D.Mass. 1977) (enforcing a written waiver clause); *Gilbert H. Moen Co. v. Spokane River Associates,* 88 Wash.App. 1064, 1997 WL 789726 (1997) (same). By contrast, clauses requiring that *modifications* of a contract be in writing are not strictly enforced. *See Reid v. Boyle,* 259 Va. 356, 369, 527 S.E.2d 137 (2000) ("Nor does it make any difference that the original written contract provided that it should not be substantially varied except by writing."). Such contracts may be modified by subsequent oral contracts or through ac-

tions of the contracting parties which "evince a mutual intent to modify," but in either case modification must by proved by "clear, unequivocal and convincing evidence." *Id.* at 370, 527 S.E.2d 137 (citing *Stanley's Cafeteria, Inc. v. Abramson,* 226 Va. 68, 73, 306 S.E.2d 870 (1983)). Even were the modification standard applicable to ExxonMobil's waiver argument, there is no "clear, unequivocal, and convincing" record evidence showing that Trex's delay in notifying ExxonMobil was intended as a modification of the Agreement's indemnification provisions; instead the record evidence reflects that the delay was inadvertent.